# OREGON *v.* ELSTAD

No. 83–773.   Argued October 3, 1984—Decided March 4, 1985

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL and REHNQUIST, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 318. STEVENS, J., filed a dissenting opinion, *post*, p. 364.

*David B. Frohnmayer*, Attorney General of Oregon, argued the cause for petitioner. With him on the brief were *William F. Gary*, Deputy Attorney General, *James E. Mountain, Jr.*, Solicitor General, and *Thomas H. Denney*, *Virginia L. Linder*, and *Stephen F. Peifer*, Assistant Attorneys General.

*Gary D. Babcock* argued the cause for respondent. With him on the brief was *Stephen J. Williams.*\*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to decide whether an initial failure of law enforcement officers to administer the warnings required by *Miranda* v. *Arizona*, 384 U. S. 436 (1966), without more, "taints" subsequent admissions made after a suspect has been fully advised of and has waived his *Miranda* rights. Respondent, Michael James Elstad, was convicted of burglary by an Oregon trial court. The Oregon Court of Appeals reversed, holding that respondent's signed confession, although voluntary, was rendered inadmissible by a prior remark made in response to questioning without benefit of *Miranda* warnings. We granted certiorari, 465 U. S. 1078 (1984), and we now reverse.

I

In December 1981, the home of Mr. and Mrs. Gilbert Gross, in the town of Salem, Polk County, Ore., was burglarized. Missing were art objects and furnishings valued at $150,000. A witness to the burglary contacted the Polk County Sheriff's Office, implicating respondent Michael Elstad, an 18-year-old neighbor and friend of the Grosses' teenage son. Thereupon, Officers Burke and McAllister went to the home of respondent Elstad, with a warrant for his arrest. Elstad's mother answered the door. She led the officers to her son's room where he lay on his bed, clad in shorts and listening to his stereo. The officers asked him to get dressed and to accompany them into the living room. Officer McAllister asked respondent's mother to step into the kitchen, where he explained that they had a warrant for her

---

\*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey,* and *David A. Strauss;* and for Americans for Effective Law Enforcement, Inc., et al. by *Fred E. Inbau, Wayne W. Schmidt, James P. Manak, David Crump,* and *Daniel B. Hales.*

son's arrest for the burglary of a neighbor's residence. Officer Burke remained with Elstad in the living room. He later testified:

"I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, 'Yes, I was there.'" App. 19–20.

The officers then escorted Elstad to the back of the patrol car. As they were about to leave for the Polk County Sheriff's office, Elstad's father arrived home and came to the rear of the patrol car. The officers advised him that his son was a suspect in the burglary. Officer Burke testified that Mr. Elstad became quite agitated, opened the rear door of the car and admonished his son: "I told you that you were going to get into trouble. You wouldn't listen to me. You never learn." *Id.*, at 21.

Elstad was transported to the Sheriff's headquarters and approximately one hour later, Officers Burke and McAllister joined him in McAllister's office. McAllister then advised respondent for the first time of his *Miranda* rights, reading from a standard card. Respondent indicated he understood his rights, and, having these rights in mind, wished to speak with the officers. Elstad gave a full statement, explaining that he had known that the Gross family was out of town and had been paid to lead several acquaintances to the Gross residence and show them how to gain entry through a defective sliding glass door. The statement was typed, reviewed by respondent, read back to him for correction, initialed and signed by Elstad and both officers. As an afterthought, Elstad added and initialed the sentence, "After leaving the house Robby & I went back to [the] van & Robby handed

me a small bag of grass." App. 42. Respondent concedes that the officers made no threats or promises either at his residence or at the Sheriff's office.

Respondent was charged with first-degree burglary. He was represented at trial by retained counsel. Elstad waived his right to a jury, and his case was tried by a Circuit Court Judge. Respondent moved at once to suppress his oral statement and signed confession. He contended that the statement he made in response to questioning at his house "let the cat out of the bag," citing *United States* v. *Bayer*, 331 U. S. 532 (1947), and tainted the subsequent confession as "fruit of the poisonous tree," citing *Wong Sun* v. *United States*, 371 U. S. 471 (1963). The judge ruled that the statement, "I was there," had to be excluded because the defendant had not been advised of his *Miranda* rights. The written confession taken after Elstad's arrival at the Sheriff's office, however, was admitted in evidence. The court found:

> "[H]is written statement was given freely, voluntarily and knowingly by the defendant after he had waived his right to remain silent and have counsel present which waiver was evidenced by the card which the defendant had signed. [It] was not tainted in any way by the previous brief statement between the defendant and the Sheriff's Deputies that had arrested him." App. 45.

Elstad was found guilty of burglary in the first degree. He received a 5-year sentence and was ordered to pay $18,000 in restitution.

Following his conviction, respondent appealed to the Oregon Court of Appeals, relying on *Wong Sun* and *Bayer*. The State conceded that Elstad had been in custody when he made his statement, "I was there," and accordingly agreed that this statement was inadmissible as having been given without the prescribed *Miranda* warnings. But the State maintained that any conceivable "taint" had been dissipated prior to the respondent's written confession by McAllister's careful administration of the requisite warnings. The Court

of Appeals reversed respondent's conviction, identifying the crucial constitutional inquiry as "whether there was a sufficient break in the stream of events between [the] inadmissible statement and the written confession to insulate the latter statement from the effect of what went before." 61 Ore. App. 673, 676, 658 P. 2d 552, 554 (1983). The Oregon court concluded:

> "Regardless of the absence of actual compulsion, the coercive impact of the unconstitutionally obtained statement remains, because in a defendant's mind it has sealed his fate. It is this impact that must be dissipated in order to make a subsequent confession admissible. In determining whether it has been dissipated, lapse of time, and change of place from the original surroundings are the most important considerations." *Id.*, at 677, 658 P. 2d, at 554.

Because of the brief period separating the two incidents, the "cat was sufficiently out of the bag to exert a coercive impact on [respondent's] later admissions." *Id.*, at 678, 658 P. 2d, at 555.

The State of Oregon petitioned the Oregon Supreme Court for review, and review was declined. This Court granted certiorari to consider the question whether the Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant.

## II

The arguments advanced in favor of suppression of respondent's written confession rely heavily on metaphor. One metaphor, familiar from the Fourth Amendment context, would require that respondent's confession, regardless of its integrity, voluntariness, and probative value, be suppressed as the "tainted fruit of the poisonous tree" of the *Miranda* violation. A second metaphor questions whether a

confession can be truly voluntary once the "cat is out of the bag." Taken out of context, each of these metaphors can be misleading. They should not be used to obscure fundamental differences between the role of the Fourth Amendment exclusionary rule and the function of *Miranda* in guarding against the prosecutorial use of compelled statements as prohibited by the Fifth Amendment. The Oregon court assumed and respondent here contends that a failure to administer *Miranda* warnings necessarily breeds the same consequences as police infringement of a constitutional right, so that evidence uncovered following an unwarned statement must be suppressed as "fruit of the poisonous tree." We believe this view misconstrues the nature of the protections afforded by *Miranda* warnings and therefore misreads the consequences of police failure to supply them.

## A

Prior to *Miranda*, the admissibility of an accused's in-custody statements was judged solely by whether they were "voluntary" within the meaning of the Due Process Clause. See, *e. g., Haynes* v. *Washington*, 373 U. S. 503 (1963); *Chambers* v. *Florida*, 309 U. S. 227 (1940). If a suspect's statements had been obtained by "techniques and methods offensive to due process," *Haynes* v. *Washington*, 373 U. S., at 515, or under circumstances in which the suspect clearly had no opportunity to exercise "a free and unconstrained will," *id.*, at 514, the statements would not be admitted. The Court in *Miranda* required suppression of many statements that would have been admissible under traditional due process analysis by presuming that statements made while in custody and without adequate warnings were protected by the Fifth Amendment. The Fifth Amendment, of course, is not concerned with nontestimonial evidence. See *Schmerber* v. *California*, 384 U. S. 757, 764 (1966) (defendant may be compelled to supply blood samples). Nor is it concerned

with moral and psychological pressures to confess emanating from sources other than official coercion. See, *e. g.,* *California* v. *Beheler,* 463 U. S. 1121, 1125, and n. 3 (1983) *(per curiam); Rhode Island* v. *Innis,* 446 U. S. 291, 303, and n. 10 (1980); *Oregon* v. *Mathiason,* 429 U. S. 492, 495–496 (1977). Voluntary statements "remain a proper element in law enforcement." *Miranda* v. *Arizona,* 384 U. S., at 478. "Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. . . . Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *United States* v. *Washington,* 431 U. S. 181, 187 (1977). As the Court noted last Term in *New York* v. *Quarles,* 467 U. S. 649, 654 (1984) (footnote omitted):

"The *Miranda* Court, however, presumed that interrogation in certain custodial circumstances is inherently coercive and . . . that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights. The prophylactic *Miranda* warnings therefore are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.' *Michigan* v. *Tucker,* 417 U. S. 433, 444 (1974); see *Edwards* v. *Arizona,* 451 U. S. 477, 492 (1981) (POWELL, J., concurring). Requiring *Miranda* warnings before custodial interrogation provides 'practical reinforcement' for the Fifth Amendment right."

Respondent's contention that his confession was tainted by the earlier failure of the police to provide *Miranda* warnings and must be excluded as "fruit of the poisonous tree" assumes the existence of a constitutional violation. This figure of speech is drawn from *Wong Sun* v. *United States,* 371 U. S. 471 (1963), in which the Court held that evidence and wit-

nesses discovered as a result of a search in violation of the Fourth Amendment must be excluded from evidence. The *Wong Sun* doctrine applies as well when the fruit of the Fourth Amendment violation is a confession. It is settled law that "a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" *Taylor* v. *Alabama*, 457 U. S. 687, 690 (1982) (quoting *Brown* v. *Illinois*, 422 U. S. 590, 602 (1975)).

But as we explained in *Quarles* and *Tucker*, a procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the "fruits" doctrine. The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits. *Dunaway* v. *New York*, 442 U. S. 200, 216–217 (1979); *Brown* v. *Illinois*, 422 U. S., at 600–602. "The exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth." *Id.*, at 601. Where a Fourth Amendment violation "taints" the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. *Taylor* v. *Alabama*, *supra*, at 690. Beyond this, the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.

The *Miranda* exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation.[1] The Fifth Amendment prohib-

---

[1] JUSTICE STEVENS expresses puzzlement at our statement that a simple failure to administer *Miranda* warnings is not in itself a violation of the Fifth Amendment. Yet the Court so held in *New York* v. *Quarles*, 467

its use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*. Thus, in the individual case, *Miranda*'s preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm. See *New York* v. *Quarles, supra,* at 654; *Michigan* v. *Tucker,* 417 U. S. 433, 444 (1974).

But the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted. Despite the fact that patently *voluntary* statements taken in violation of *Miranda* must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination. *Harris* v. *New York,* 401 U. S. 222 (1971). The Court in *Harris* rejected as an "extravagant extension of the Constitution," the theory that a defendant who had confessed under circumstances that made the confession inadmissible, could thereby enjoy the freedom to "deny every fact disclosed or discovered as a 'fruit' of his confession, free from confrontation with his prior statements" and that the voluntariness of his confession would be totally irrelevant. *Id.,* at 225, and n. 2. Where an unwarned statement is preserved for use in situations that fall outside the sweep of the *Miranda* presumption, "the primary criterion of admissibility

---

U. S. 649, 654 (1983), and *Michigan* v. *Tucker,* 417 U. S. 433, 444 (1974). The *Miranda* Court itself recognized this point when it disclaimed any intent to create a "constitutional straitjacket" and invited Congress and the States to suggest "potential alternatives for protecting the privilege." 384 U. S., at 467. A *Miranda* violation does not *constitute* coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements. It has never been remotely suggested that any statement taken from Mr. Elstad without benefit of *Miranda* warnings would be admissible.

[remains] the 'old' due process voluntariness test." Schulhofer, Confessions and the Court, 79 Mich. L. Rev. 865, 877 (1981).

In *Michigan* v. *Tucker*, *supra*, the Court was asked to extend the *Wong Sun* fruits doctrine to suppress the testimony of a witness for the prosecution whose identity was discovered as the result of a statement taken from the accused without benefit of full *Miranda* warnings. As in respondent's case, the breach of the *Miranda* procedures in *Tucker* involved no actual compulsion. The Court concluded that the unwarned questioning "did not abridge respondent's constitutional privilege . . . but departed only from the prophylactic standards later laid down by this Court in *Miranda* to safeguard that privilege." 417 U. S., at 446. Since there was no actual infringement of the suspect's constitutional rights, the case was not controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed. In deciding "how sweeping the judicially imposed consequences" of a failure to administer *Miranda* warnings should be, 417 U. S., at 445, the *Tucker* Court noted that neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression of the witness' testimony. The unwarned confession must, of course, be suppressed, but the Court ruled that introduction of the third-party witness' testimony did not violate Tucker's Fifth Amendment rights.

We believe that this reasoning applies with equal force when the alleged "fruit" of a noncoercive *Miranda* violation is neither a witness nor an article of evidence but the accused's own voluntary testimony. As in *Tucker*, the absence of any coercion or improper tactics undercuts the twin rationales—trustworthiness and deterrence—for a broader rule. Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities. The Court has often noted: "'[A] living witness is not to be

mechanically equated with the proffer of inanimate evidentiary objects illegally seized. . . . [T]he living witness is an individual human personality whose attributes of will, perception, memory and *volition* interact to determine what testimony he will give.'" *United States* v. *Ceccolini*, 435 U. S. 268, 277 (1978) (emphasis added) (quoting from *Smith* v. *United States*, 117 U. S. App. D. C. 1, 3–4, 324 F. 2d 879, 881–882 (1963) (Burger, J.) (footnotes omitted), cert. denied, 377 U. S. 954 (1964)).

Because *Miranda* warnings may inhibit persons from giving information, this Court has determined that they need be administered only after the person is taken into "custody" or his freedom has otherwise been significantly restrained. *Miranda* v. *Arizona*, 384 U. S., at 478. Unfortunately, the task of defining "custody" is a slippery one, and "policemen investigating serious crimes [cannot realistically be expected to] make no errors whatsoever." *Michigan* v. *Tucker*, *supra*, at 446. If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

B

The Oregon court, however, believed that the unwarned remark compromised the voluntariness of respondent's later confession. It was the court's view that the prior *answer*

and not the unwarned questioning impaired respondent's ability to give a valid waiver and that only lapse of time and change of place could dissipate what it termed the "coercive impact" of the inadmissible statement. When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession. See *Westover* v. *United States*, decided together with *Miranda* v. *Arizona*, 384 U. S., at 494; *Clewis* v. *Texas*, 386 U. S. 707 (1967). The failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. See *New York* v. *Quarles*, 467 U. S., at 654, and n. 5; *Miranda* v. *Arizona*, *supra*, at 457. Of the courts that have considered whether a properly warned confession must be suppressed because it was preceded by an unwarned but clearly voluntary admission, the majority have explicitly or implicitly recognized that *Westover*'s requirement of a break in the stream of events is inapposite.[2] In these circumstances, a careful and thorough

[2] See, *e. g.*, *United States* v. *Bowler*, 561 F. 2d 1323, 1326 (CA9 1977); *Tanner* v. *Vincent*, 541 F. 2d 932 (CA2 1976); *United States* v. *Toral*, 536 F. 2d 893, 896–897 (CA9 1976); *United States* v. *Knight*, 395 F. 2d 971, 975 (CA2 1968); *State* v. *Montes*, 136 Ariz. 491, 496–497, 667 P. 2d 191, 196–197 (1983); *State* v. *Derrico*, 181 Conn. 151, 166–167, 434 A. 2d 356, 365–366, cert. denied, 449 U. S. 1064 (1980); *State* v. *Holt*, 354 So. 2d 888, 890 (Fla. App.), cert. denied, 361 So. 2d 832 (Fla. 1978); *Fried* v. *State*, 42 Md. App. 643, 644–648, 402 A. 2d 101, 102–104 (1979); *Commonwealth* v. *White*, 353 Mass. 409, 232 N. E. 2d 335 (1967); *State* v. *Sickels*, 275 N. W. 2d 809, 813–814 (Minn. 1979); *State* v. *Dakota*, 300 Minn. 12, 217 N. W. 2d 748 (1974); *State* v. *Raymond*, 305 Minn. 160, 170, 232 N. W. 2d 879, 886 (1975) (noting common thread in line of cases holding prejudicial coercion not present "just because [defendant] had made an earlier confession which 'let the cat out of the bag' "); *Commonwealth* v. *Chacko*, 500 Pa. 571, 580–582, 459 A. 2d 311, 316 (1983) ("After being given his *Miranda* warnings it is clear [defendant] maintained his intention to provide his questioners with

administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an "act of free will." *Wong Sun* v. *United States*, 371 U. S., at 486.

The Oregon court nevertheless identified a subtle form of lingering compulsion, the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate. But endowing the psychological effects of *voluntary* unwarned admissions with constitutional implications would, practically speaking, disable the police from obtaining the suspect's informed cooperation even when the official coercion proscribed by the Fifth Amendment played no part in either his warned or unwarned confessions. As the Court remarked in *Bayer:*

> "[A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession may always be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." 331 U. S., at 540–541.

Even in such extreme cases as *Lyons* v. *Oklahoma*, 322 U. S. 596 (1944), in which police forced a full confession from the accused through unconscionable methods of interrogation, the Court has assumed that the coercive effect of the confes-

his version of the incident"). But see *In re Pablo A. C.*, 129 Cal. App. 3d 984, 181 Cal. Rptr. 468 (1982); *State* v. *Hibdon*, 57 Ore. App. 509, 645 P. 2d 580 (1982); *State* v. *Lavaris*, 99 Wash. 2d 851, 857–860, 664 P. 2d 1234, 1237–1239 (1983).

sion could, with time, be dissipated.   See also *Westover* v. *United States*, *supra*, at 496.

This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver.   The Oregon court, by adopting this expansive view of Fifth Amendment compulsion, effectively immunizes a suspect who responds to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver of the privilege of remaining silent.   See 61 Ore. App., at 679, 658 P. 2d, at 555 (Gillette, P. J., concurring). This immunity comes at a high cost to legitimate law enforcement activity, while adding little desirable protection to the individual's interest in not being *compelled* to testify against himself.   Cf. *Michigan* v. *Mosley*, 423 U. S. 96, 107–111 (1975) (WHITE, J., concurring in result).   When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder.

There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a "guilty secret" freely given in response to an unwarned but non-coercive question, as in this case.   JUSTICE BRENNAN's contention that it is impossible to perceive any causal distinction between this case and one involving a confession that is coerced by torture is wholly unpersuasive.[3]   Certainly, in

---

[3] Most of the 50 cases cited by JUSTICE BRENNAN in his discussion of consecutive confessions concern an initial unwarned statement obtained through overtly or inherently coercive methods which raise serious Fifth Amendment and due process concerns.   Without describing each case cited, the following are representative of the situations JUSTICE BRENNAN views as analogous to this case: *e. g., Darwin* v. *Connecticut*, 391 U. S. 346 (1968) (suspect interrogated for 48 hours incommunicado while officers denied access to counsel); *Beecher* v. *Alabama*, 389 U. S. 35, 36 (1967) (officer fired rifle next to suspect's ear and said "If you don't tell the truth I am

respondent's case, the causal connection between any psychological disadvantage created by his admission and his ultimate decision to cooperate is speculative and attenuated at

going to kill you"); *Clewis* v. *Texas*, 386 U. S. 707 (1967) (suspect was arrested without probable cause, interrogated for nine days with little food or sleep, and gave three unwarned "confessions" each of which he immediately retracted); *Reck* v. *Pate*, 367 U. S. 433, 439–440, n. 3 (1961) (mentally retarded youth interrogated incommunicado for a week "during which time he was frequently ill, fainted several times, vomited blood on the floor of the police station and was twice taken to the hospital on a stretcher"). Typical of the state cases cited in the dissent's discussion are: *e. g.*, *Cagle* v. *State*, 45 Ala. App. 3, 4, 221 So. 2d 119, 120 (1969) (police interrogated wounded suspect at police station for one hour before obtaining statement, took him to hospital to have his severe wounds treated, only then giving the *Miranda* warnings; suspect prefaced second statement with "I have already give the Chief a statement and I might as well give one to you, too"), cert. denied, 284 Ala. 727, 221 So. 2d 121 (1969); *People* v. *Saiz*, 620 P. 2d 15 (Colo. 1980) (two hours' unwarned custodial interrogation of 16-year-old in violation of state law requiring parent's presence, culminating in visit to scene of crime); *People* v. *Bodner*, 75 App. Div. 2d 440, 430 N. Y. S. 2d 433 (1980) (confrontation at police station and at scene of crime between police and retarded youth with mental age of eight or nine); *State* v. *Badger*, 141 Vt. 430, 441, 450 A. 2d 336, 343 (1982) (unwarned "close and intense" station house questioning of 15-year-old, including threats and promises, resulted in confession at 1:20 a. m.; court held "[w]arnings . . . were insufficient to cure such blatant abuse or compensate for the coercion in this case").

JUSTICE BRENNAN cannot seriously mean to equate such situations with the case at bar. Likewise inapposite are the cases the dissent cites concerning suspects whose invocation of their rights to remain silent and to have counsel present were flatly ignored while police subjected them to continued interrogation. See, *e. g.*, *United States ex rel. Sanders* v. *Rowe*, 460 F. Supp. 1128 (ND Ill. 1978); *People* v. *Braeseke*, 25 Cal. 3d 691, 602 P. 2d 384 (1979), vacated on other grounds, 446 U. S. 932 (1980); *Smith* v. *State*, 132 Ga. App. 491, 208 S. E. 2d 351 (1974). Finally, many of the decisions JUSTICE BRENNAN claims require that the "taint" be "dissipated" simply recite the stock "cat" and "tree" metaphors but go on to find the second confession voluntary without identifying any break in the stream of events beyond the simple administration of a careful and thorough warning. See cases cited in n. 2, *supra*.

Out of the multitude of decisions JUSTICE BRENNAN cites, no more than half a dozen fairly can be said to suppress confessions on facts remotely

best. It is difficult to tell with certainty what motivates a suspect to speak. A suspect's confession may be traced to factors as disparate as "a prearrest event such as a visit with a minister," *Dunaway* v. *New York*, 442 U. S., at 220 (STEVENS, J., concurring), or an intervening event such as the exchange of words respondent had with his father. We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

## III

Though belated, the reading of respondent's rights was undeniably complete. McAllister testified that he read the *Miranda* warnings aloud from a printed card and recorded

---

comparable to those in the instant case, and some of these decisions involved other elements not present here. See *United States* v. *Pierce*, 397 F. 2d 128 (CA4 1968) (thorough custodial interrogation at station house); *United States* v. *Pellegrini*, 309 F. Supp. 250, 257 (SDNY 1970) (officers induced unwarned suspect to produce "the clinching evidence of his crime"); *In re Pablo A. C.*, 129 Cal. App. 3d 984, 181 Cal. Rptr. 468 (1982) (25-minute interrogation of juvenile; court finds causal connection but notes that all prior cited cases relying on "cat-out-of-bag" theory have involved coercion); *State* v. *Lekas*, 201 Kan. 579, 442 P. 2d 11 (1968) (parolee taken into custody and questioned at courthouse). At least one State Supreme Court cited by JUSTICE BRENNAN that read *Miranda* as mandating suppression of a subsequent voluntary and fully warned confession did so with express reluctance, convinced that admissibility of a subsequent confession should turn on voluntariness alone. See *Brunson* v. *State*, 264 So. 2d 817, 819–820 (Miss. 1972).

Elstad's responses.[4]   There is no question that respondent knowingly and voluntarily waived his right to remain silent before he described his participation in the burglary.   It is also beyond dispute that respondent's earlier remark was voluntary, within the meaning of the Fifth Amendment. Neither the environment nor the manner of either "interrogation" was coercive.   The initial conversation took place at midday, in the living room area of respondent's own home, with his mother in the kitchen area, a few steps away. Although in retrospect the officers testified that respondent was then in custody, at the time he made his statement he had not been informed that he was under arrest.   The arresting officers' testimony indicates that the brief stop in the living room before proceeding to the station house was not to interrogate the suspect but to notify his mother of the reason for his arrest.   App. 9–10.

The State has conceded the issue of custody and thus we must assume that Burke breached *Miranda* procedures in failing to administer *Miranda* warnings before initiating the discussion in the living room.   This breach may have been the result of confusion as to whether the brief exchange qualified as "custodial interrogation" or it may simply have reflected Burke's reluctance to initiate an alarming police

---

[4] The *Miranda* advice on the card was clear and comprehensive, incorporating the warning that any statements could be used in a court of law; the rights to remain silent, consult an attorney at state expense, and interrupt the conversation at any time; and the reminder that any statements must be voluntary.   The reverse side of the card carried three questions in boldface and recorded Elstad's responses:

"DO YOU UNDERSTAND THESE RIGHTS?  'Yeh'

"DO YOU HAVE ANY QUESTIONS ABOUT YOUR RIGHTS?  'No'

"HAVING THESE RIGHTS IN MIND, DO YOU WISH TO TALK TO US NOW?  'Yeh I do!'"

The card is dated and signed by respondent and by Officer McAllister. A recent high school graduate, Elstad was fully capable of understanding this careful administering of *Miranda* warnings.

procedure before McAllister had spoken with respondent's mother. Whatever the reason for Burke's oversight, the incident had none of the earmarks of coercion. See *Rawlings* v. *Kentucky,* 448 U. S. 98, 109–110 (1980). Nor did the officers exploit the unwarned admission to pressure respondent into waiving his right to remain silent.

Respondent, however, has argued that he was unable to give a fully *informed* waiver of his rights because he was unaware that his prior statement could not be used against him. Respondent suggests that Officer McAllister, to cure this deficiency, should have added an additional warning to those given him at the Sheriff's office. Such a requirement is neither practicable nor constitutionally necessary. In many cases, a breach of *Miranda* procedures may not be identified as such until long after full *Miranda* warnings are administered and a valid confession obtained. See, *e. g., United States* v. *Bowler,* 561 F. 2d 1323, 1324–1325 (CA9 1977) (certain statements ruled inadmissible by trial court); *United States* v. *Toral,* 536 F. 2d 893, 896 (CA9 1976); *United States* v. *Knight,* 395 F. 2d 971, 974–975 (CA2 1968) (custody unclear). The standard *Miranda* warnings explicitly inform the suspect of his right to consult a lawyer before speaking. Police officers are ill-equipped to pinch-hit for counsel, construing the murky and difficult questions of when "custody" begins or whether a given unwarned statement will ultimately be held admissible. See *Tanner* v. *Vincent,* 541 F. 2d 932, 936 (CA2 1976), cert. denied, 429 U. S. 1065 (1977).

This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness. See *California* v. *Beheler,* 463 U. S., at 1125–1126, n. 3; *McMann* v. *Richardson,* 397 U. S. 759, 769 (1970). If the prosecution has actually violated the defendant's Fifth Amendment rights by introducing an inadmissible confession at trial, compelling the defendant to testify in rebuttal, the rule announced in *Harrison* v. *United States,* 392 U. S. 219 (1968), precludes use of that testimony

on retrial. "Having 'released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony." *Id.*, at 224–225. But the Court has refused to find that a defendant who confesses, after being falsely told that his codefendant has turned State's evidence, does so involuntarily. *Frazier* v. *Cupp*, 394 U. S. 731, 739 (1969). The Court has also rejected the argument that a defendant's ignorance that a prior coerced confession could not be admitted in evidence compromised the voluntariness of his guilty plea. *McMann* v. *Richardson, supra,* at 769. Likewise, in *California* v. *Beheler, supra,* the Court declined to accept defendant's contention that, because he was unaware of the potential adverse consequences of statements he made to the police, his participation in the interview was involuntary. Thus we have not held that the *sine qua non* for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all of the consequences flowing from the nature and the quality of the evidence in the case.

## IV

When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief. The Court has carefully adhered to this principle, permitting a narrow exception only where pressing public safety concerns demanded. See *New York* v. *Quarles,* 467 U. S., at 655–656. The Court today in no way retreats from the bright-line rule of *Miranda.* We do not imply that good faith excuses a failure to administer *Miranda* warnings; nor do we condone inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him. A handful of courts have, however, applied our precedents relating to confessions ob-

tained under coercive circumstances to situations involving wholly voluntary admissions, requiring a passage of time or break in events before a second, fully warned statement can be deemed voluntary. Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary.[5] The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.

The judgment of the Court of Appeals of Oregon is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

The Self-Incrimination Clause of the Fifth Amendment guarantees every individual that, if taken into official cus-

---

[5] JUSTICE BRENNAN, with an apocalyptic tone, heralds this opinion as dealing a "crippling blow to *Miranda*." *Post*, at 319. JUSTICE BRENNAN not only distorts the reasoning and holding of our decision, but, worse, invites trial courts and prosecutors to do the same.

tody, he shall be informed of important constitutional rights and be given the opportunity knowingly and voluntarily to waive those rights before being interrogated about suspected wrongdoing. *Miranda* v. *Arizona*, 384 U. S. 436 (1966).[1] This guarantee embodies our society's conviction that "no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights." *Escobedo* v. *Illinois*, 378 U. S. 478, 490 (1964).

Even while purporting to reaffirm these constitutional guarantees, the Court has engaged of late in a studied campaign to strip the *Miranda* decision piecemeal and to undermine the rights *Miranda* sought to secure. Today's decision not only extends this effort a further step, but delivers a potentially crippling blow to *Miranda* and the ability of courts to safeguard the rights of persons accused of crime. For at least with respect to successive confessions, the Court today appears to strip remedies for *Miranda* violations of the "fruit of the poisonous tree" doctrine prohibiting the use of evidence presumptively derived from official illegality.[2]

Two major premises undergird the Court's decision. The Court rejects as nothing more than "speculative" the long-recognized presumption that an illegally extracted confession causes the accused to confess again out of the mistaken belief that he already has sealed his fate, and it condemns as "'extravagant'" the requirement that the prosecution affirmatively rebut the presumption before the subsequent confes-

---

[1] "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." 384 U. S., at 444.

[2] The Court repeatedly casts its analysis in terms of the "fruits" of a *Miranda* violation, see *ante*, at 306, 307, 308, but its dicta nevertheless surely should not be read as necessarily foreclosing application of derivative-evidence rules where the *Miranda* violation produces evidence other than a subsequent confession by the accused. See n. 29, *infra*.

sion may be admitted.  *Ante*, at 307, 313.   The Court instead adopts a new rule that, so long as the accused is given the usual *Miranda* warnings before further interrogation, the taint of a previous confession obtained in violation of *Miranda* "ordinarily" must be viewed as *automatically* dissipated. *Ante*, at 311.

In the alternative, the Court asserts that neither the Fifth Amendment itself nor the judicial policy of deterring illegal police conduct requires the suppression of the "fruits" of a confession obtained in violation of *Miranda*, reasoning that to do otherwise would interfere with "legitimate law enforcement activity."  *Ante*, at 312.   As the Court surely understands, however, "[t]o forbid the direct use of methods . . . but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty.'"   *Nardone* v. *United States*, 308 U. S. 338, 340 (1939).   If violations of constitutional rights may not be remedied through the well-established rules respecting derivative evidence, as the Court has held today, there is a critical danger that the rights will be rendered nothing more than a mere "form of words." *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385, 392 (1920).

The Court's decision says much about the way the Court currently goes about implementing its agenda.   In imposing its new rule, for example, the Court mischaracterizes our precedents, obfuscates the central issues, and altogether ignores the practical realities of custodial interrogation that have led nearly every lower court to reject its simplistic reasoning.   Moreover, the Court adopts startling and unprecedented methods of construing constitutional guarantees.   Finally, the Court reaches out once again to address issues not before us.   For example, although the State of Oregon has conceded that the arresting officers broke the law in this case, the Court goes out of its way to suggest that they may have been objectively justified in doing so.

Today's decision, in short, threatens disastrous consequences far beyond the outcome in this case. As the Court has not seen fit to provide a full explanation for this result, I believe it essential to consider in detail the premises, reasoning, and implications of the Court's opinion.

I

The threshold question is this: What effect should an admission or confession of guilt obtained in violation of an accused's *Miranda* rights be presumed to have upon the voluntariness of subsequent confessions that are preceded by *Miranda* warnings? Relying on the "cat out of the bag" analysis of *United States* v. *Bayer*, 331 U. S. 532, 540–541 (1947), the Oregon Court of Appeals held that the first confession presumptively taints subsequent confessions in such circumstances. 61 Ore. App. 673, 676, 658 P. 2d 552, 554 (1983). On the specific facts of this case, the court below found that the prosecution had not rebutted this presumption. Rather, given the temporal proximity of Elstad's second confession to his first and the absence of any significant intervening circumstances, the court correctly concluded that there had not been "a sufficient break in the stream of events between [the] inadmissible statement and the written confession to insulate the latter statement from the effect of what went before." *Ibid.*

If this Court's reversal of the judgment below reflected mere disagreement with the Oregon court's application of the "cat out of the bag" presumption to the particular facts of this case, the outcome, while clearly erroneous, would be of little lasting consequence. But the Court rejects the "cat out of the bag" presumption *entirely* and instead adopts a new rule presuming that "ordinarily" there is *no* causal connection between a confession extracted in violation of *Miranda* and a subsequent confession preceded by the usual *Miranda* warnings. *Ante*, at 311, 314. The Court suggests that it is merely following settled lower-court practice in adopting this

rule and that the analysis followed by the Oregon Court of Appeals was aberrant.   This is simply not so.   Most federal courts have rejected the Court's approach and instead held that (1) there is a rebuttable presumption that a confession obtained in violation of *Miranda* taints subsequent confessions, and (2) the taint cannot be dissipated solely by giving *Miranda* warnings.[3]   Moreover, those few federal courts that have suggested approaches similar to the Court's have subsequently qualified their positions.[4]   Even more significant is the case among state courts.   Although a handful have adopted the Court's approach,[5] the overwhelming ma-

---

[3] See, *e. g.*, *United States* v. *Lee*, 699 F. 2d 466, 468–469 (CA9 1982); *United States* v. *Nash*, 563 F. 2d 1166, 1169 (CA5 1977); *Randall* v. *Estelle*, 492 F. 2d 118, 120 (CA5 1974); *Fisher* v. *Scafati*, 439 F. 2d 307, 311 (CA1), cert. denied, 403 U. S. 939 (1971); *United States* v. *Pierce*, 397 F. 2d 128, 130–131 (CA4 1968); *Evans* v. *United States*, 375 F. 2d 355, 360–361 (CA8 1967), rev'd on other grounds *sub nom. Bruton* v. *United States*, 391 U. S. 123 (1968); *United States ex rel. Sanders* v. *Rowe*, 460 F. Supp. 1128, 1137–1138 (ND Ill. 1978); *United States* v. *Pellegrini*, 309 F. Supp. 250, 257 (SDNY 1970).   Cf. *Killough* v. *United States*, 114 U. S. App. D. C. 305, 312, 315 F. 2d 241, 248 (1962) (Wright, J., concurring) (*McNabb-Mallory* violation) (*McNabb* v. *United States*, 318 U. S. 332 (1943); *Mallory* v. *United States*, 354 U. S. 449 (1957)).

[4] Three decisions from the Second and Ninth Circuits that are cited in the Court's opinion reached similar results.   See *ante*, at 310, n. 2, citing *United States* v. *Bowler*, 561 F. 2d 1323 (CA9 1977); *United States* v. *Toral*, 536 F. 2d 893 (CA9 1976); and *United States* v. *Knight*, 395 F. 2d 971 (CA2 1968), cert. denied, 395 U. S. 930 (1969).   Yet subsequent decisions of the Ninth Circuit have made clear that *Bowler* and *Toral* have not led to an abandonment of traditional derivative-evidence analysis in that jurisdiction.   See, *e. g.*, *United States* v. *Lee, supra*, at 468–469 ("Here, the second confession, a virtual repetition of the first, was obtained less than 24 hours after the first confession was elicited without *Miranda* warnings. . . . [T]he [second] confession was correctly suppressed as the fruit of the poisonous tree").   And the Second Circuit has expressly reserved the question whether "the exclusion of a second confession might be required in order to deter avoidance of *Miranda* in obtaining the first."   *Tanner* v. *Vincent*, 541 F. 2d 932, 937, n. 5 (1976), cert. denied, 429 U. S. 1065 (1977).

[5] See, *e. g.*, *State* v. *Montes*, 136 Ariz. 491, 496–497, 667 P. 2d 191, 196–197 (1983) (en banc); *State* v. *Holt*, 354 So. 2d 888, 890 (Fla. App.),

jority of state courts that have considered the issue have concluded that subsequent confessions are presumptively tainted by a first confession taken in violation of *Miranda* and that *Miranda* warnings alone cannot dissipate the taint.[6]

cert. denied, 361 So. 2d 832 (Fla. 1978); *Fried* v. *State*, 42 Md. App. 643, 646–648, 402 A. 2d 101, 102–104 (1979).

[6] See, *e. g.*, *Cagle* v. *State*, 45 Ala. App. 3, 4, 221 So. 2d 119, 120 (subsequent confession suppressed), cert. denied, 284 Ala. 727, 221 So. 2d 121 (1969); *People* v. *Braeseke*, 25 Cal. 3d 691, 703–704, 602 P. 2d 384, 391–392 (1979) (same), vacated on other grounds, 446 U. S. 932 (1980); *In re Pablo A. C.*, 129 Cal. App. 3d 984, 989–991, 181 Cal. Rptr. 468, 471–472 (1982) (same); *People·* v. *Saiz*, 620 P. 2d 15, 19–21 (Colo. 1980) (en banc) (same); *People* v. *Algien*, 180 Colo. 1, 8, 501 P. 2d 468, 471 (1972) (en banc) (same); *State* v. *Derrico*, 181 Conn. 151, 165–167, 434 A. 2d 356, 365–366 (taint dissipated), cert. denied, 449 U. S. 1064 (1980); *Smith* v. *State*, 132 Ga. App. 491, 492, 208 S. E. 2d 351 (1974) (subsequent confession suppressed); *State* v. *Medeiros*, 4 Haw. App. 248, 252–253, 665 P. 2d 181, 184–185 (1983) (taint dissipated); *People* v. *Jordan*, 90 Ill. App. 3d 489, 495, 413 N. E. 2d 195, 199 (1980) (subsequent confession suppressed); *People* v. *Raddatz*, 91 Ill. App. 2d 425, 429–436, 235 N. E. 2d 353, 355–359 (1968) (same); *State* v. *Gress*, 210 Kan. 850, 852–854, 504 P. 2d 256, 259–261 (1972) (taint dissipated); *State* v. *Lekas*, 201 Kan. 579, 585–588, 442 P. 2d 11, 17–19 (1968) (subsequent confession suppressed); *State* v. *Young*, 344 So. 2d 983, 987 (La. 1977) (taint dissipated); *State* v. *Welch*, 337 So. 2d 1114, 1120 (La. 1976) (subsequent confession suppressed); *State* v. *Ayers*, 433 A. 2d 356, 362 (Me. 1981) (trial statement suppressed); *State* v. *Sickels*, 275 N. W. 2d 809, 813–814 (Minn. 1979) (taint dissipated); *State* v. *Raymond*, 305 Minn. 160, 168–172, 232 N. W. 2d 879, 884–886 (1975) (same); *Brunson* v. *State*, 264 So. 2d 817, 819–820 (Miss. 1972) (subsequent confession suppressed); *State* v. *Wright*, 515 S. W. 2d 421, 426–427 (Mo. 1974) (en banc) (taint dissipated); *State* v. *Williams*, 486 S. W. 2d 468, 474 (Mo. 1972) (subsequent confession suppressed); *In re R. P. S.*, —— Mont. ——, ——, 623 P. 2d 964, 968–969 (1981) (taint dissipated); *Rhodes* v. *State*, 91 Nev. 17, 21–22, 530 P. 2d 1199, 1201–1202 (1975) (dictum); *People* v. *Bodner*, 75 App. Div. 2d 440, 447–449, 430 N. Y. S. 2d 433, 438–439 (1980) (subsequent confession suppressed); *State* v. *Edwards*, 284 N. C. 76, 78–81, 199 S. E. 2d 459, 461–462 (1973) (same); *State* v. *Hibdon*, 57 Ore. App. 509, 512, 645 P. 2d 580 (1982) (same); *Commonwealth* v. *Chacko*, 500 Pa. 571, 580–582, 459 A. 2d 311, 316 (1983) (taint dissipated); *Commonwealth* v. *Wideman*, 460 Pa. 699, 708–709, 334 A. 2d 594, 599 (1975) (subsequent confession suppressed); *State* v. *Branch*, 298 N. W. 2d 173, 175–176 (S. D. 1980) (taint dissipated);

The Court today sweeps aside this common-sense approach as "speculative" reasoning, adopting instead a rule that "the psychological impact of *voluntary* disclosure of a guilty secret" neither "qualifies as state compulsion" nor "compromises the voluntariness" of subsequent confessions. *Ante,* at 312, 313 (emphasis added). So long as a suspect receives the usual *Miranda* warnings before further interrogation, the Court reasons, the fact that he "is free to exercise his own volition in deciding whether or not to make" further confessions "ordinarily" is a sufficient "cure" and serves to break any causal connection between the illegal confession and subsequent statements. *Ante,* at 308, 311.

The Court's marble-palace psychoanalysis is tidy, but it flies in the face of our own precedents, demonstrates a startling unawareness of the realities of police interrogation, and is completely out of tune with the experience of state and federal courts over the last 20 years. Perhaps the Court has grasped some psychological truth that has eluded persons far more experienced in these matters; if so, the Court owes an explanation of how so many could have been so wrong for so many years.

A

(1)

This Court has had long experience with the problem of confessions obtained after an earlier confession has been

---

*Martin* v. *State,* 1 Tenn. Crim. App. 282, 289–291, 440 S. W. 2d 624, 627–628 (1968) (subsequent confession suppressed); *State* v. *Badger,* 141 Vt. 430, 439–441, 450 A. 2d 336, 342–343 (1982) (same); *State* v. *Lavaris,* 99 Wash. 2d 851, 856–860, 664 P. 2d 1234, 1237–1239 (1983) (en banc) (same).

The Court scrambles to distinguish some of the cases cited in this footnote and in notes 3 and 4, *supra,* arguing that "JUSTICE BRENNAN cannot seriously mean to equate" these precedents with the case at hand. *Ante,* at 313, n. 3. To the contrary. Although many of these cases unquestionably raised traditional due process questions on their individual facts, that is not the ground on which they were decided. Instead, courts in every one of the cited cases explicitly or implicitly recognized the applicability of traditional derivative-evidence analysis in evaluating the consequences of *Miranda* violations.

illegally secured. Subsequent confessions in these circumstances are not *per se* inadmissible, but the prosecution must demonstrate facts "sufficient to insulate the [subsequent] statement from the effect of all that went before." *Clewis* v. *Texas*, 386 U. S. 707, 710 (1967). If the accused's subsequent confession was merely the culmination of "one continuous process," or if the first confession was merely "filled in and perfected by additional statements given in rapid succession," the subsequent confession is inadmissible even though it was not obtained through the same illegal means as the first. *Leyra* v. *Denno*, 347 U. S. 556, 561 (1954); see also *Westover* v. *United States*, decided together with *Miranda* v. *Arizona*, 384 U. S. 436, 494–496 (1966). The question in each case is whether the accused's will was "overborne at the time he confessed," and the prosecution must demonstrate that the second confession "was an act independent of the [earlier] confession." *Reck* v. *Pate*, 367 U. S. 433, 440, 444 (1961).

One of the factors that can vitiate the voluntariness of a subsequent confession is the hopeless feeling of an accused that he has nothing to lose by repeating his confession, even where the circumstances that rendered his first confession illegal have been removed. As the Court observed in *United States* v. *Bayer*, 331 U. S., at 540:

> "[A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as a fruit of the first."

The Court today decries the "irremediable consequences" of this reasoning, *ante*, at 309, but it has always been clear that even after "let[ting] the cat out of the bag" the accused is not "perpetually disable[d]" from giving an admissible subsequent confession. *United States* v. *Bayer, supra*, at 541.

Rather, we have held that subsequent confessions in such circumstances may be admitted if the prosecution demonstrates that, "[c]onsidering the 'totality of the circumstances,'" there was a "'break in the stream of events . . . sufficient to insulate'" the subsequent confession from the damning impact of the first. *Darwin* v. *Connecticut*, 391 U. S. 346, 349 (1968) (citations omitted). Although we have thus rejected a *per se* rule forbidding the introduction of subsequent statements in these circumstances, we have emphasized that the psychological impact of admissions and confessions of criminal guilt nevertheless can have a decisive impact in undermining the voluntariness of a suspect's responses to continued police interrogation and must be accounted for in determining their admissibility. As Justice Harlan explained in his separate *Darwin* opinion:

> "A principal reason why a suspect might make a second or third confession is simply that, having already confessed once or twice, he might think he has little to lose by repetition. If a first confession is not shown to be voluntary, I do not think a later confession that is merely a direct product of the earlier one should be held to be voluntary. It would be neither conducive to good police work, nor fair to a suspect, to allow the erroneous impression that he has nothing to lose to play the major role in a defendant's decision to speak a second or third time.
> 
> "In consequence, when the prosecution seeks to use a confession uttered after an earlier one not found to be voluntary, it has . . . the burden of proving not only that the later confession was not itself the product of improper threats or promises or coercive conditions, but also that it was not directly produced by the existence of the earlier confession." *Id.*, at 350–351 (concurring in part and dissenting in part).

See also *Brown* v. *Illinois*, 422 U. S. 590, 605, n. 12 (1975) ("The fact that Brown had made one statement, believed by

him to be admissible, . . . bolstered the pressures for him to give the second, or at least vitiated any incentive on his part to avoid self-incrimination"); *Beecher* v. *Alabama*, 389 U. S. 35, 36, n. 2 (1967) *(per curiam)* (existence of earlier illegal confession "is of course vitally relevant to the voluntariness of petitioner's later statements").[7]

---

[7] The application of the "cat out of the bag" presumption is further illustrated by our decision in *Harrison* v. *United States*, 392 U. S. 219 (1968). Harrison took the stand at his trial in an attempt to rebut illegally obtained confessions that the prosecution had been permitted to introduce into evidence. His conviction was overturned on appeal because of the introduction of these confessions. On retrial, Harrison's earlier trial testimony was introduced and led to his second conviction. We reversed that conviction, reasoning that if Harrison testified "in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Id.*, at 223. We observed:

"It is, of course, difficult to unravel the many considerations that might have led the petitioner to take the witness stand at his former trial. But, having illegally placed his confessions before the jury, the Government can hardly demand a demonstration by the petitioner that he would not have testified as he did if his inadmissible confessions had not been used. 'The springs of conduct are subtle and varied,' Mr. Justice Cardozo once observed. 'One who meddles with them must not insist upon too nice a measure of proof that the spring which he released was effective to the exclusion of all others.' Having 'released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony." *Id.*, at 224–225 (footnotes omitted).

The Court today cryptically acknowledges the *Harrison* precedent, *ante*, at 316–317, but it wholly fails to explain the palpable inconsistencies between its reasoning and the logical force of *Harrison*. Courts considering the applicability of *Harrison* to cases similar to the one before us have correctly recognized that it sheds controlling light on whether to presume a causal connection between illegal confessions and an individual's decision to speak again. See, *e. g.*, *Randall* v. *Estelle*, 492 F. 2d, at 120–121; *Fisher* v. *Scafati*, 439 F. 2d, at 311; *People* v. *Saiz*, 620 P. 2d, at 19; *Commonwealth* v. *Wideman*, 460 Pa., at 709, 334 A. 2d, at 599; *State* v. *Lavaris*, 99 Wash. 2d, at 859, 664 P. 2d, at 1238. See also *State* v. *Ayers*, 433 A. 2d, at 362 (citing cases).

(2)

Our precedents did not develop in a vacuum. They reflect an understanding of the realities of police interrogation and the everyday experience of lower courts. Expert interrogators, far from dismissing a first admission or confession as creating merely a "speculative and attenuated" disadvantage for a suspect, *ante*, at 313, understand that such revelations frequently lead directly to a full confession. Standard interrogation manuals advise that "[t]he securing of the first admission is the biggest stumbling block . . . ." A. Aubry & R. Caputo, Criminal Interrogation 290 (3d ed. 1980). If this first admission can be obtained, "there is every reason to expect that the first admission will lead to others, and eventually to the full confession." *Ibid.*

> "For some psychological reason which does not have to concern us at this point 'the dam finally breaks as a result of the first leak' with regards to the tough subject. . . . Any structure is only as strong as its weakest component, and total collapse can be anticipated when the weakest part first begins to sag." *Id.*, at 291.

Interrogators describe the point of the first admission as the "breakthrough" and the "beachhead," R. Royal & S. Schutt, The Gentle Art of Interviewing and Interrogation: A Professional Manual and Guide 143 (1976), which once obtained will give them enormous "tactical advantages," F. Inbau & J. Reid, Criminal Interrogation and Confessions 82 (2d ed. 1967). See also W. Dienstein, Technics for the Crime Investigator 117 (2d ed. 1974). Thus "[t]he securing of incriminating admissions might well be considered as the beginning of the final stages in crumbling the defenses of the suspect," and the process of obtaining such admissions is described as "the spadework required to motivate the subject into making the full confession." Aubry & Caputo, *supra*, at 31, 203.

"Once the initial admission has been made, further induce-
ment in the form of skillfully applied interrogation techniques
will motivate the suspect into making the confession." *Id.*,
at 26; see also *id.*, at 33 (initial admissions are "capitalized
upon by the interrogator in securing the eventual confes-
sion"). Some of these "skillfully applied" techniques involve
direct confrontation of the suspect with the earlier admission,
but many of the techniques are more discreet and create
leverage without the need of expressly discussing the earlier
admission. These techniques are all aimed at reinforcing in
the suspect's mind that, as one manual describes it, "'you're
wasting your own time, and you're wasting my time, you're
guilty and you know it, I know it, what's more, you know
that I know it.'" *Id.*, at 234.[8]

The practical experience of state and federal courts con-
firms the experts' understanding. From this experience,
lower courts have concluded that a first confession obtained
without proper *Miranda* warnings, far from creating merely
some "speculative and attenuated" disadvantage for the
accused, *ante*, at 313, frequently enables the authorities to
obtain subsequent confessions on a "silver platter." *Cagle* v.
*State*, 45 Ala. App. 3, 4, 221 So. 2d 119, 120, cert. denied, 284
Ala. 727, 221 So. 2d 121 (1969).

One police practice that courts have frequently encoun-
tered involves the withholding of *Miranda* warnings until
the end of an interrogation session. Specifically, the police

---

[8] See also A. Aubry & R. Caputo, Criminal Interrogation 206 (3d ed.
1980) (discussing the "fait accompli," or "what's done is done, and you can't
change it now" approach), *id.*, at 239 (discussing the "I would sure hate to
be in your shoes" and the "[t]hings sure look dark for you" techniques);
F. Inbau & J. Reid, Criminal Interrogation and Confessions 26–31 (2d ed.
1967) (displaying an air of confidence in the subject's guilt), *id.*, at 77 (cre-
ating the impression of the futility of resistance); R. Royal & S. Schutt,
The Gentle Art of Interviewing and Interrogation: A Professional Manual
and Guide 145–149 (1976) (techniques for "capitaliz[ing]" on the "break-
through" admission).

escort a suspect into a room, sit him down and, without explaining his Fifth Amendment rights or obtaining a knowing and voluntary waiver of those rights, interrogate him about his suspected criminal activity. If the police obtain a confession, it is then typed up, the police hand the suspect a pen for his signature, and—just before he signs—the police advise him of his *Miranda* rights and ask him to proceed. Alternatively, the police may call a stenographer in after they have obtained the confession, advise the suspect for the first time of his *Miranda* rights, and ask him to repeat what he has just told them. In such circumstances, the process of giving *Miranda* warnings and obtaining the final confession is " 'merely a formalizing, a setting down almost as a scrivener does, [of] what ha[s] already taken [place].' " *People* v. *Raddatz*, 91 Ill. App. 2d 425, 430, 235 N. E. 2d 353, 356 (1968) (quoting trial court). In such situations, where "it was all over except for reading aloud and explaining the written waiver of the *Miranda* safeguards," courts have time and again concluded that "[t]he giving of the *Miranda* warnings before reducing the product of the day's work to written form could not undo what had been done or make legal what was illegal." *People* v. *Bodner*, 75 App. Div. 2d 440, 448, 430 N. Y. S. 2d 433, 438 (1980).[9]

There are numerous variations on this theme. Police may obtain a confession in violation of *Miranda* and then take a break for lunch or go home for the evening. When questioning is resumed, this time preceded by *Miranda* warnings, the suspect is asked to "clarify" the earlier illegal confession and to provide additional information.[10] Or he is led by one of

[9] See also *United States* v. *Nash*, 563 F. 2d, at 1168; *People* v. *Saiz*, 620 P. 2d, at 20; *State* v. *Lekas*, 201 Kan., at 581–582, 442 P. 2d, at 14–15; *Commonwealth* v. *Wideman*, 460 Pa., at 704, 334 A. 2d, at 597; *State* v. *Badger*, 141 Vt., at 434–437, 450 A. 2d, at 339–340; *State* v. *Lavaris*, 99 Wash. 2d, at 854–856, 664 P. 2d, at 1236–1237.

[10] See, *e. g.*, *United States* v. *Lee*, 699 F. 2d, at 467–469; *Smith* v. *State*, 132 Ga. App., at 491–492, 208 S. E. 2d, at 351; *State* v. *Welch*, 337 So. 2d, at 1120; *Martin* v. *State*, 1 Tenn. Crim. App., at 289–290, 440 S. W. 2d, at 627; *State* v. *Badger*, *supra*, at 440, 450 A. 2d, at 342.

the interrogators into another room, introduced to another official, and asked to repeat his story. The new officer then gives the *Miranda* warnings and asks the suspect to proceed.[11] Alternatively, the suspect might be questioned by arresting officers "in the field" and without *Miranda* warnings, as was young Elstad in the instant case. After making incriminating admissions or a confession, the suspect is then brought into the station house and either questioned by the same officers again or asked to repeat his earlier statements to another officer.[12]

The variations of this practice are numerous, but the underlying problem is always the same: after hearing the witness testimony and considering the practical realities, courts have confirmed the time-honored wisdom of presuming that a first illegal confession "taints" subsequent confessions, and permitting such subsequent confessions to be admitted at trial *only* if the prosecution convincingly rebuts the presumption. They have discovered that frequently, "[h]aving once confessed [the accused] was ready to confess some more." *State* v. *Lekas*, 201 Kan. 579, 587–588, 442 P. 2d 11, 19 (1968). For all practical purposes, the prewarning and postwarning questioning are often but stages of one overall interrogation. Whether or not the authorities explicitly confront the suspect with his earlier illegal admissions makes no significant difference, of course, because the suspect knows that the authorities know of his earlier statements and most frequently will believe that those statements already have sealed his fate. Thus a suspect in such circumstances is likely to conclude that "he might as well answer the questions

---

[11] See, *e. g.*, *United States* v. *Pierce*, 397 F. 2d, at 129–130; *Evans* v. *United States*, 375 F. 2d, at 358; *Cagle* v. *State*, 45 Ala. App., at 4, 221 So. 2d, at 120; *People* v. *Braeseke*, 25 Cal. 3d, at 695–696, 602 P. 2d, at 386–388; *People* v. *Algien*, 180 Colo., at 4–5, 501 P. 2d, at 469–470; *People* v. *Raddatz*, 91 Ill. App. 2d, at 428–429, 235 N. E. 2d, at 355; *Rhodes* v. *State*, 91 Nev., at 21, 530 P. 2d, at 1201.

[12] See, *e. g.*, *Randall* v. *Estelle*, 492 F. 2d, at 119–120; *In re Pablo A. C.*, 129 Cal. App. 3d, at 987–988, 181 Cal. Rptr., at 470; Note, 45 Denver L. J. 427, 462–463 (1968).

put to him, since the [authorities are] already aware of the earlier answers," *United States* v. *Pierce,* 397 F. 2d 128, 131 (CA4 1968); he will probably tell himself that "it's O. K., I have already told them," *State* v. *Lekas, supra,* at 582, 442 P. 2d, at 15. See also *Cagle* v. *State,* 45 Ala. App., at 4, 221 So. 2d, at 120 ("I have already give[n] the Chief . . . a statement, and I might as well give one to you, too"). In such circumstances, courts have found, a suspect almost invariably asks himself, "What use is a lawyer? What good is a lawyer now? What benefit can a lawyer tell me? *[sic]* I have already told the police everything." *People* v. *Raddatz,* 91 Ill. App. 2d, at 430, 235 N. E. 2d, at 356.[13]

I would have thought that the Court, instead of dismissing the "cat out of the bag" presumption out of hand, would have accounted for these practical realities. Compare *Nardone* v. *United States,* 308 U. S., at 342 (derivative-evidence rules should be grounded on the "learning, good sense, fairness and courage" of lower-court judges). Expert interrogators and experienced lower-court judges will be startled, to say the least, to learn that the connection between multiple confessions is "speculative" and that a subsequent rendition of *Miranda* warnings "ordinarily" enables the accused in these circumstances to exercise his "free will" and to make "a rational and intelligent choice whether to waive or invoke his rights." . *Ante,* at 311, 314.

### (3)

The Court's new view about the "psychological impact" of prior illegalities also is at odds with our Fourth Amendment

---

[13] See also *Killough* v. *United States,* 114 U. S. App. D. C., at 313–314, 315 F. 2d, at 249–250 (Wright, J., concurring) (*McNabb-Mallory* violation) ("[H]uman nature being what it is, we must recognize a presumption that one [confession] is the fruit of the other. . . . While the psychological helplessness that comes from surrender need not last forever, . . . the burden should be on the Government to show that a second confession did not spring from a mind in which all the mechanisms of resistance are still subdued by defeat and the apparent futility of further combat").

precedents. For example, it is well established that a confession secured as a proximate result of an illegal arrest must be suppressed. See, *e. g.*, *Taylor* v. *Alabama*, 457 U. S. 687 (1982); *Brown* v. *Illinois*, 422 U. S. 590 (1975); *Wong Sun* v. *United States*, 371 U. S. 471 (1963). We have emphasized in this context that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Wong Sun* v. *United States, supra,* at 485.

The Court seeks to distinguish these precedents on the ground that Fourth Amendment violations require a broader exclusionary rule than do Fifth Amendment violations. *Ante,* at 306. I address this reasoning in Part II–B, *infra.* But the question immediately at issue—whether there should be a presumptive rule against finding a causal connection between successive confessions—would surely seem to be controlled by the logic of these Fourth Amendment cases. In part because of the inherent psychological pressures attendant upon an arrest, we have refused to presume that a confession following an illegal arrest is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun* v. *United States, supra,* at 486. See also *Brown* v. *Illinois, supra,* at 601–603. If the Court so quickly dismisses the notion of a multiple-confession taint as nothing more than a "speculative and attenuated" disadvantage, *ante,* at 313, what is to prevent it in the future from deciding that, contrary to the settled understanding, the fact of a proximate illegal arrest is presumptively nothing but a "speculative and attenuated" disadvantage to a defendant who is asked to confess?

Similarly, a confession obtained as a proximate result of confronting the accused with illegally seized evidence is inadmissible as the fruit of the illegal seizure. See, *e. g.*, *Fahy* v. *Connecticut*, 375 U. S. 85, 90–91 (1963) (remanding for determination whether admission was so induced); see generally 3 W. LaFave, Search and Seizure § 11.4, pp. 638–642

(1978) (collecting cases). As commentators have noted, courts in finding such confessions to be tainted by the Fourth Amendment violation have emphasized that "'the realization that the "cat is out of the bag" plays a significant role in encouraging the suspect to speak.'" *Id.*, § 11.4, p. 639 (footnote omitted). By discarding the accepted "cat out of the bag" presumption in the successive-confession context, however, the Court now appears to have opened the door to applying this same simplistic reasoning to Fourth Amendment violations.[14]

---

[14] The Court cites three cases in support of its assertion that an illegally obtained "guilty secret" does not "ordinarily" compromise the voluntariness of a subsequent confession preceded by the usual *Miranda* warnings. *Ante*, at 316–317. These cases are all inapposite. The Court in *McMann* v. *Richardson*, 397 U. S. 759 (1970), held that a defendant's guilty plea may not be attacked on federal collateral review on the ground that it was induced by the mistaken assumption that an illegal confession might have been admitted at trial and have led to conviction. *Id.*, at 770. The Court emphasized that this bar applies only when the defendant pleads in "open court" and the decision not to challenge the confession is based on "the good-faith evaluations of a reasonably competent attorney." *Id.*, at 770, 773. Thus the defendant's decision to reiterate the confession is insulated in these circumstances by the assistance of counsel *and* review by a court—factors wholly absent in the confession context at hand. The Court in *McMann* noted that collateral review *is* available where the defendant "was incompetently advised by his attorney," *id*, at 772, and in light of this qualification I cannot see how that case is at all analogous to *uncounseled* decisions to repeat a proximate confession.

Similarly, in *Frazier* v. *Cupp*, 394 U. S. 731 (1969), the Court held that police misrepresentations concerning an accomplice, while "relevant" to the admissibility of the defendant's confession, did not vitiate the voluntariness of the confession under the totality of the circumstances of that case. *Id.*, at 739. The defendant there, however, had received warnings which were proper at the time. *Ibid.* And under the Fifth Amendment, there of course are significant distinctions between the use of third-party statements in obtaining a confession and the use of the accused's own previously compelled illegal admissions.

Finally, the respondent in *California* v. *Beheler*, 463 U. S. 1121 (1983) *(per curiam)*, was not in custody at all when he spoke with the police, and

## B

The correct approach, administered for almost 20 years by most courts with no untoward results, is to presume that an admission or confession obtained in violation of *Miranda* taints a subsequent confession unless the prosecution can show that the taint is so attenuated as to justify admission of the subsequent confession. See cases cited in nn. 3, 6, *supra*. Although the Court warns against the "irremediable consequences" of this presumption, *ante*, at 309, it is obvious that a subsequent confession, just like any other evidence that follows upon illegal police action, does not become "sacred and inaccessible." *Silverthorne Lumber Co.* v. *United States*, 251 U. S., at 392. As with any other evidence, the inquiry is whether the subsequent confession " 'has been come at by exploitation of [the] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun* v. *United States*, 371 U. S., at 488 (citation omitted).

Until today the Court has recognized that the dissipation inquiry requires the prosecution to demonstrate that the official illegality did not taint the challenged confession, and we have rejected the simplistic view that abstract notions of "free will" are alone sufficient to dissipate the challenged taint.

"The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The work-

---

the Court rejected his contention that "his lack of awareness [of the consequences of what he said] transformed the situation into a custodial one." *Id.*, at 1125, n. 3. The Court emphasized that a person is in "custody" for purposes of the Fifth Amendment only if "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.*, at 1125 (citation omitted). Michael Elstad obviously was in custody at the time he was questioned. See Part II–D, *infra*.

ings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of [constitutional rights] to turn on . . . a talismanic test." *Brown* v. *Illinois,* 422 U. S., at 603.

Instead, we have instructed courts to consider carefully such factors as the strength of the causal connection between the illegal action and the challenged evidence, their proximity in time and place, the presence of intervening factors, and the "purpose and flagrancy of the official misconduct." *Id.,* at 603–604.

The Court today shatters this sensitive inquiry and decides instead that, since individuals possess "'will, perception, memory and volition,'" a suspect's "exercise [of] his own volition in deciding whether or not to make a [subsequent] statement to the authorities" must "ordinarily" be viewed as sufficient to dissipate the coercive influence of a prior confession obtained in violation of *Miranda.* *Ante,* at 308, 309, 311 (citation omitted). But "[w]ill, perception, memory and volition are only relevant as they provide meaningful alternatives in the causal chain, not as mystical qualities which in themselves invoke the doctrine of attenuation." Hirtle, Inadmissible Confessions and Their Fruits: A Comment on Harrison v. United States, 60 J. Crim. L., C., & P. S. 58, 62 (1969). Thus we have *always* rejected, until today, the notion that "individual will" alone presumptively serves to insulate a person's actions from the taint of earlier official illegality. See, *e. g., United States* v. *Ceccolini,* 435 U. S. 268, 274–275 (1978) (rejecting Government's request for a rule "that the testimony of a live witness should not be excluded at trial no matter how close and proximate the connection between it" and an illegal search); *Wong Sun* v. *United States, supra,* at 486 (confession obtained as a proximate result of an illegal arrest is not presumptively admissible as an "intervening independent act of a free will").

Nor have we ever allowed *Miranda* warnings alone to serve talismanically to purge the taint of prior illegalities. In *Brown* v. *Illinois,* for example, we emphasized that

"*Miranda* warnings, *alone* and *per se,* cannot always make [a confession] sufficiently a product of free will to break . . . the causal connection between [an illegal arrest] and the confession." 422 U. S., at 603 (emphasis in original).[15]   See also *Taylor* v. *Alabama,* 457 U. S., at 690–691.   The reason we rejected this rule is manifest: "The *Miranda* warnings in no way inform a person of his Fourth Amendment rights, including his right to be released from unlawful custody following an arrest made without a warrant or without probable cause." *Brown* v. *Illinois, supra,* at 601, n. 6.

This logic applies with even greater force to the Fifth Amendment problem of successive confessions.   Where an accused believes that it is futile to resist because the authorities already have elicited an admission of guilt, the mere rendition of *Miranda* warnings does not convey the information most critical at that point to ensuring his informed and voluntary decision to speak again: that the earlier confession may not be admissible and thus that he need not speak out of any feeling that he already has sealed his fate.   The Court therefore is flatly wrong in arguing, as it does repeatedly, that the mere provision of *Miranda* warnings prior to subsequent interrogation supplies the accused with "the relevant information" and ensures that a subsequent confession "ordinarily" will be the product of "a rational and intelligent choice" and " 'an act of free will.' "   *Ante,* at 311, 314.[16]

---

[15] Under a contrary rule, we emphasized, "[a]ny incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.' " 422 U. S., at 602–603.

[16] See, *e. g., Fisher* v. *Scafati,* 439 F. 2d, at 311 ("All that intervened between the two confessions was a full *Miranda* warning, which of course did not warn the defendant that the first confession was invalid and could not be used against him"); *People* v. *Saiz,* 620 P. 2d, at 20; *People* v. *Raddatz,* 91 Ill. App. 2d, at 434, 235 N. E. 2d, at 357–358 ("If a suspect is to intelligently waive his Fifth Amendment rights he is entitled to know the scope of the amendment's protection at the time he is being interrogated.   In the absence of this knowledge of the consequence of his prior

The Court's new approach is therefore completely at odds with established dissipation analysis. A comparison of the Court's analysis with the factors most frequently relied on by lower courts in considering the admissibility of subsequent confessions demonstrates the practical and legal flaws of the new rule.

*Advice that earlier confession may be inadmissible.* The most effective means to ensure the voluntariness of an accused's subsequent confession is to advise the accused that his earlier admissions may not be admissible and therefore that he need not speak solely out of a belief that "the cat is out of the bag." Many courts have required such warnings in the absence of other dissipating factors,[17] and this Court has not uncovered anything to suggest that this approach has not succeeded in the real world. The Court, however, believes that law enforcement authorities could never possibly understand "the murky and difficult questio[n]" of when

confession, Raddatz' waiver of rights cannot be considered one intelligently made"); *State* v. *Lavaris,* 99 Wash. 2d, at 860, 664 P. 2d, at 1239. See also Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Calif. L. Rev. 579, 608–609 (1968). Cf. *Killough* v. *United States,* 114 U. S. App. D. C., at 313, 315 F. 2d, at 249 (Wright, J., concurring) ("The assumption that a commissioner's statement to an accused, who has already confessed, that he may remain silent, will immediately remove the psychological disadvantage he suffers when confronting the same officers, who know his secret, is simply unrealistic").

[17] "It has also been held, generally, that the influence of the improper inducement is removed when the accused is properly cautioned before the subsequent confession. The warning so given, however, should be explicit, and it ought to be full enough to apprise the accused (1) that anything he may say after such warning can be used against him; and (2) that his previous confession, made under improper inducement, cannot be used against him." 2 F. Wharton, Criminal Evidence § 359, p. 66 (12th ed. 1955) (citing cases). See also *Williams* v. *United States,* 328 F. 2d 669, 672–673 (CA5 1964); *State* v. *Edwards,* 284 N. C., at 80–81, 199 S. E. 2d, at 462; *State* v. *Williams,* 162 W. Va. 309, 318, 249 S. E. 2d 758, 764 (1978); 1 W. LaFave & J. Israel, Criminal Procedure § 9.4, p. 747, § 9.5, p. 767 (1984); E. Cleary, McCormick on Evidence § 157, pp. 345–346 (2d ed. 1972).

*Miranda* warnings must be given, and therefore that they are "ill-equipped" to make the decision whether supplementary warnings might be required. *Ante,* at 316.

This reasoning is unpersuasive for two reasons. First, the whole point of *Miranda* and its progeny has been to prescribe "bright line" rules for the authorities to follow.[18] Although borderline cases will of course occasionally arise, thus militating against a *per se* rule requiring supplementary warnings, the experience of the lower courts demonstrates that the vast majority of confrontations implicating this question involve obvious *Miranda* violations. The occasional "murky and difficult" case should not preclude consideration of supplementary warnings in situations where the authorities could not possibly have acted in an objectively reasonable manner in their earlier interrogation of the accused. Second, even where the authorities are not certain that an earlier confession has been illegally obtained, courts and commentators have recognized that a supplementary warning merely advising the accused that his earlier confession *may* be inadmissible can dispel his belief that he has nothing to lose by repetition.[19]

*Proximity in time and place.* Courts have frequently concluded that a subsequent confession was so removed in time and place from the first that the accused most likely was able fully to exercise his independent judgment in deciding whether to speak again.[20] As in the instant case, however, a

---

[18] See n. 41, *infra.*

[19] In addition to the sources cited in n. 17, *supra,* see Note, 45 Denver L. J., *supra* n.. 12, at 463, suggesting the following warning: "Nothing that you may have said or confessed to prior to this time to any law enforcement official may be used against you in any way unless they first told you of your right to remain silent and to talk to an attorney and have him present during questioning, and you then agreed to talk to them. Do you understand?"

[20] See, *e. g., State* v. *Raymond,* 305 Minn., at 171–172, 232 N. W. 2d, at 886.

second confession frequently follows immediately on the heels of the first and is obtained by the same officials in the same or similar coercive surroundings. In such situations, it is wholly unreasonable to assume that the mere rendition of *Miranda* warnings will safeguard the accused's freedom of action.

The Court today asserts, however, that the traditional requirement that there be a "break in the stream of events" is "inapposite" in this context. *Ante,* at 310. Yet most lower courts that have considered the question have recognized that our decision in *Westover* v. *United States,* 384 U. S., at 494, compels the contrary conclusion.[21] There the accused was questioned by local authorities for several hours and then turned over to federal officials, who only then advised him of his constitutional rights and obtained a confession. We concluded that Westover's waiver was invalid because, from Westover's perspective, the separate questioning amounted to but one continuous period of interrogation, "the warnings came at the end of the interrogation process," and the giving of warnings could not dissipate the effect of

---

[21] See, *e. g., State* v. *Medeiros,* 4 Haw. App., at 252–253, 665 P. 2d, at 184–185; *People* v. *Raddatz,* 91 Ill. App. 2d, at 431–433, 235 N. E. 2d, at 356–357; *State* v. *Lekas,* 201 Kan., at 585, 442 P. 2d, at 17; *People* v. *Bodner,* 75 App. Div. 2d, at 447–448, 430 N. Y. S. 2d, at 438; *State* v. *Badger,* 141 Vt., at 439–440, 450 A. 2d, at 342; *State* v. *Lavaris, supra,* at 857–858, 664 P. 2d, at 1237–1238. See also *People* v. *Saiz,* 620 P. 2d, at 20; *Rhodes* v. *State,* 91 Nev., at 21, 530 P. 2d, at 1201. See generally George, The Fruits of Miranda: Scope of the Exclusionary Rule, 39 U. Colo. L. Rev. 478, 492–494 (1967); Pitler, 56 Calif. L. Rev., *supra* n. 16, at 612–613, 618; Comment, 41 Brooklyn L. Rev. 325, 330 (1974); Note, 45 Denver L. J., *supra* n. 12, at 461–463.

After reviewing the cases cited in nn. 3–6, *supra,* the Court pronounces that "the majority have explicitly or implicitly recognized that *Westover's* requirement of a break in the stream of events is inapposite." *Ante,* at 310, and n. 1. This is incorrect. Whether "explicitly" or "implicitly," the majority of the cited cases have "recognized" precisely the contrary.

the earlier, illegal questioning. *Id.*, at 496.[22] Thus it is clear that *Miranda* warnings given at the end of the interrogation process cannot dispel the illegality of what has gone before. If this is so in a situation like *Westover*, where the accused had not yet given a confession, how can the Court possibly conclude otherwise where the accused already has confessed and therefore feels that he has nothing to lose by "confess[ing] some more?" *State* v. *Lekas*, 201 Kan., at 588, 442 P. 2d, at 19.

*Intervening factors.* Some lower courts have found that because of intervening factors—such as consultation with a lawyer or family members, or an independent decision to speak—an accused's subsequent confession could not fairly be attributed to the earlier statement taken in violation of *Miranda*.[23] On the other hand, where as here an accused has continuously been in custody and there is no legitimate suggestion of an intervening event sufficient to break the impact of the first confession, subsequent confessions are inadmissible.[24] The Court reasons, however, that because "[a] suspect's confession *may* be traced to . . . an intervening event," it *"must* [be] conclude[d]" that subsequent *Miranda* warnings presumptively enable the suspect to make "a rational and intelligent choice" whether to repeat his confession. *Ante*, at 314 (emphasis added). In applying the intervening-events inquiry, however, "courts must use a surgeon's scalpel and not a meat axe." Cf. 3 W. LaFave, Search and Seizure § 11.4, p. 624 (1978). The only proper inquiry is whether a meaningful intervening event *actually* occurred, not whether

---

[22] We advised: "A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them." 384 U. S., at 496.

[23] See, *e. g.*, *State* v. *Medeiros, supra*, at 252–253, 665 P. 2d, at 184–185; *In re R. P. S.*, —— Mont., at ——, 623 P. 2d, at 969.

[24] See cases in nn. 16, 22, *supra*.

a court simply chooses to shut its eyes to human nature and the realities of custodial interrogation.

*Purpose and flagrancy of the illegality.* Courts have frequently taken the "purpose and flagrancy of the official misconduct" into account in considering whether the taint of illegal action was sufficiently dissipated to render a confession admissible. *Brown* v. *Illinois,* 422 U. S., at 604. In part, this inquiry has reflected conviction that particularly egregious misconduct must be deterred through particularly stern action. This factor is also important, however, because it is fair to presume that if the authorities acted flagrantly in violating the law they probably did so for ulterior motives. Thus if the authorities blatantly failed to advise an accused of his constitutional rights while interrogating him and gave him the *Miranda* warnings only as they handed him a typed confession for his signature, it is fair to presume that they pursued their strategy precisely to weaken his ability knowingly and voluntarily to exercise his constitutional rights.

C

Perhaps because the Court is discomfited by the radical implications of its failure to apply the settled derivative-evidence presumption to violations of *Miranda,* it grudgingly qualifies its sweeping pronouncements with the acknowledgment that its new presumption about so-called "ordinary" *Miranda* violations can be overcome by the accused. *Ante,* at 311, 314. Explicitly eschewing "a *per se* rule," *ante,* at 317, the Court suggests that its approach should not be followed where the police have employed "improper tactics" or "inherently coercive methods" that are "calculated to undermine the suspect's ability to exercise his free will." *Ante,* at 308, 309, 312, n. 3; see also *ante,* at 312, 314, 317. The Court thus concedes that lower courts must continue to be free to "examine the surrounding circumstances and the

entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Ante,* at 318.

The Court's concessions are potentially significant, but its analysis is wholly at odds with established dissipation analysis. To begin with, the Court repeatedly suggests that a confession may be suppressed only if the police have used "improper tactics," *ante,* at 308; this obscure reasoning overlooks the fact that a violation of *Miranda* is obviously *itself* an "improper tactic," one frequently used precisely to undermine the voluntariness of subsequent confessions. See *supra,* at 329–332. The Court's negative implication that *Miranda* violations are *not* "improper tactics" is, to say the least, disquieting. Second, the Court reasons that the fact that the accused gave a subsequent confession is *itself* "highly probative" evidence that he was able to exercise his free will. *Ante,* at 318. This inaccurate premise follows from the Court's erroneous rejection of the "cat out of the bag" presumption in these circumstances and its inexplicable assertion that the previous extraction of a "guilty secret" neither constitutes compulsion nor compromises the voluntariness of later confessions. *Ante,* at 312.[25] Finally, the

---

[25] The Court appears to limit the reach of its "guilty secret" doctrine to so-called "voluntary" confessions, but the logic of its analysis raises disturbing implications for the application of derivative-evidence rules to involuntarily obtained confessions. If a confession were extracted through savage beatings or other unconscionable techniques, and the accused were then permitted a good night's sleep and were questioned the next day by sympathetic officers, most would agree that the subsequent confession, if given out of the defeated feeling that the accused had nothing more to lose, should not be admissible because it just as surely was the product of torture as the earlier confession. Yet the Court permitted the admission of just such a confession in *Lyons* v. *Oklahoma,* 322 U. S. 596 (1944). In light of the maturation of our scruples against such techniques over the past 40 years, I believe such a result would be impossible today. See, *e. g., Darwin* v. *Connecticut,* 391 U. S. 346, 350–351 (1968) (Harlan, J., concurring in part and dissenting in part). Yet today the Court cites

foundation of the derivative-evidence doctrine has always been that, where the authorities have acted illegally, *they* must bear the "ultimate burden" of proving that their misconduct did not "taint" subsequently obtained evidence. *Alderman* v. *United States,* 394 U. S. 165, 183 (1969); see also *Nardone* v. *United States,* 308 U. S., at 341. That is precisely the point of the derivative-evidence presumption. By rejecting this presumption in *Miranda* cases, the Court today appears to adopt a "go ahead and try to prove it" posture toward citizens whose Fifth Amendment *Miranda* rights have been violated, an attitude that marks a sharp break from the Court's traditional approach to official lawlessness.

Nevertheless, prudent law enforcement officials must not now believe that they are wholly at liberty to refuse to give timely warnings and obtain effective waivers, confident that evidence derived from *Miranda* violations will be entirely immune from judicial scrutiny. I believe that most state and federal courts will continue to exercise the "learning, good sense, fairness and courage" they have displayed in administering the derivative-evidence rules prior to today's decision. *Nardone* v. *United States, supra,* at 342. Lower courts are free to interpret the Court's qualifications, grudging though they may be, as providing sufficient latitude to scrutinize confessions obtained in the wake of *Miranda* violations to determine whether, in light of all "the surrounding circumstances and the entire course of police conduct," the initial *Miranda* violation compromised the voluntariness of the accused's subsequent confession. *Ante,* at 318. Any overt

---

*Lyons* as support for its "guilty secret" doctrine. *Ante,* at 311–312. Although I am confident that the entire Court would never sanction the multiple-confession technique employed in *Lyons,* I nevertheless respectfully submit that it is impossible to perceive any causal distinction between the "guilty secret" consequences of a confession that is presumptively coerced under *Miranda* and one that is actually coerced through torture.

use of the illegally secured statement by the police in obtaining the subsequent confession must of course be viewed as powerful evidence of a tainted connection; the Court itself asserts that the officers in this case did not "exploit the unwarned admission to pressure respondent" into giving his subsequent confession. *Ante,* at 316.[26] In such circumstances, "[h]aving 'released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his [subsequent statements]." *Harrison* v. *United States,* 392 U. S. 219, 224–225 (1968).

Moreover, courts must scrutinize the totality of the circumstances even where the authorities have not explicitly exploited the earlier confession. Many of the police practices discussed above do not rely on overt use of the earlier confession at all, but instead are implicit strategies that create leverage on the accused to believe he already has sealed his fate. See *supra,* at 328–332. These strategies are just as pernicious as overt exploitation of the illegal confession, because they just as surely are "calculated to undermine the suspect's ability to exercise his free will." *Ante,* at 309.[27] In evaluating the likely effects of such tactics, courts should continue to employ many of the same elements traditionally used in dissipation analysis. Thus, although the Court discounts the importance of a "break in the stream of events" in

---

[26] The Court's reliance on this qualification undermines the fallacious suggestion elsewhere in its opinion that an illegally obtained "guilty secret" may be used to secure a confession. *Ante,* at 312.

[27] See, *e. g.,* Pitler, 56 Calif. L. Rev., *supra* n. 16, at 617: "[P]olice could procure a confession absent the warnings, then take the suspect out for dinner, let him shower, shave, get a good twelve hours sleep, and the next day let two different officers warn and question him. The questioning need not even refer tangentially to the previous confession; for the suspect has those spoken words imprinted on his mind and assumes they can be used against him. Under such circumstances is any waiver the product of a free will and a rational intellect?"

the context of the derivative-evidence *presumption*, the proximity in time and place of the first and second confessions surely remains a critical factor. See *supra*, at 339–341. So too does the inquiry into possible intervening events. *Supra*, at 341–342. And if the official violation of *Miranda* was flagrant, courts may fairly conclude that the violation was calculated and employed precisely so as to "undermine the suspect's ability to exercise his free will." *Ante*, at 309. See also *ante*, at 314 ("deliberately . . . improper tactics" warrant a presumption of compulsion).[28]

In sum, today's opinion marks an evisceration of the established fruit of the poisonous tree doctrine, but its reasoning is sufficiently obscure and qualified as to leave state and federal courts with continued authority to combat obvious flouting by the authorities of the privilege against self-incrimination. I am confident that lower courts will exercise this authority responsibly, as they have for the most part prior to this Court's intervention.

## II

Not content merely to ignore the practical realities of police interrogation and the likely effects of its abolition of the derivative-evidence presumption, the Court goes on to assert that nothing in the Fifth Amendment or the general judicial policy of deterring illegal police conduct "ordinarily" requires the suppression of evidence derived proximately from a confession obtained in violation of *Miranda*. The Court does not limit its analysis to successive confessions, but recurrently refers generally to the "fruits" of the illegal confession. *Ante*, at 306, 307, 308. Thus the potential impact of the Court's reasoning might extend far beyond the

---

[28] In addition, the Court concedes that its new analysis does *not* apply where the authorities have ignored the accused's actual invocation of his *Miranda* rights to remain silent or to consult with counsel. *Ante*, at 312–314, n. 3. In such circumstances, courts should continue to apply the traditional presumption of tainted connection.

"cat out of the bag" context to include the discovery of physical evidence and other derivative fruits of *Miranda* violations as well.[29]

## A

The Fifth Amendment requires that an accused in custody be informed of important constitutional rights before the authorities interrogate him. *Miranda* v. *Arizona*. This requirement serves to combat the "inherently compelling pressures" of custodial questioning "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," and is a prerequisite to securing the accused's informed and voluntary waiver of his

---

[29] Notwithstanding the sweep of the Court's language, today's opinion surely ought not be read as also foreclosing application of the traditional derivative-evidence presumption to physical evidence obtained as a proximate result of a *Miranda* violation. The Court relies heavily on individual "volition" as an insulating factor in successive-confession cases. *Ante,* at 308–309, 314. Although the Court's reliance on this factor is clearly misplaced, see *supra,* at 328–332, the factor is altogether missing in the context of inanimate evidence.

As they have in successive-confession cases, most courts considering the issue have recognized that physical evidence proximately derived from a *Miranda* violation is presumptively inadmissible. See, *e. g., United States* v. *Downing,* 665 F. 2d 404, 407–409 (CA1 1981); *United States* v. *Castellana,* 488 F. 2d 65, 67–68 (CA5 1974); *In re Yarber,* 375 So. 2d 1231, 1234–1235 (Ala. 1979); *People* v. *Braeseke,* 25 Cal. 3d, at 703–704, 602 P. 2d, at 391–392; *People* v. *Schader,* 71 Cal. 2d 761, 778–779, 457 P. 2d 841, 851–852 (1969); *State* v. *Lekas,* 201 Kan., at 588–589, 442 P. 2d, at 19–20; *State* v. *Preston,* 411 A. 2d 402, 407–408 (Me. 1980); *In re Appeal No. 245 (75),* 29 Md. App. 131, 147–153, 349 A. 2d 434, 444–447 (1975); *Commonwealth* v. *White,* 374 Mass. 132, 138–139, 371 N. E. 2d 777, 781 (1977), aff'd by an equally divided Court, 439 U. S. 280 (1978); *People* v. *Oramus,* 25 N. Y. 2d 825, 826–827, 250 N. E. 2d 723, 724 (1969); *Commonwealth* v. *Wideman,* 478 Pa. 102, 104–107, 385 A. 2d 1334, 1335–1336 (1978); *Noble* v. *State,* 478 S. W. 2d 83, 84 (Tex. Crim. App. 1972); *State* v. *Badger,* 141 Vt., at 453–454, 450 A. 2d, at 349–350. Cf. *People* v. *Briggs,* 668 P. 2d 961, 962–963 (Colo. App. 1983); *State* v. *Williams,* 162 W. Va., at 318–319, 249 S. E. 2d, at 764.

rights. 384 U. S., at 467. Far from serving merely as a prophylactic safeguard, "[t]he requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege . . . ." *Id.*, at 476. It is precisely because this requirement embraces rights that are deemed to serve a "central role in the preservation of basic liberties," *Malloy* v. *Hogan*, 378 U. S. 1, 5 (1964), that it is binding on the States through the Fourteenth Amendment, *Miranda* v. *Arizona*, 384 U. S., at 467.

Twice in the last 10 years, however, the Court has suggested that the *Miranda* safeguards are not themselves rights guaranteed by the Fifth Amendment. In *Michigan* v. *Tucker*, 417 U. S. 433 (1974), the Court stated that *Miranda* had only prescribed "recommended" procedural safeguards "to provide practical reinforcement for the right against compulsory self-incrimination," the violation of which may not necessarily violate the Fifth Amendment itself. 417 U. S., at 443–444. And in *New York* v. *Quarles*, 467 U. S. 649 (1984), the Court last Term disturbingly rejected the argument that a confession "must be *presumed* compelled because of . . . failure to read [the accused] his *Miranda* warnings." *Id.*, at 655, n. 5 (emphasis in original).

These assertions are erroneous. *Miranda*'s requirement of warnings and an effective waiver was not merely an exercise of supervisory authority over interrogation practices. As Justice Douglas noted in his *Tucker* dissent:

> "*Miranda*'s purpose was not promulgation of judicially preferred standards for police interrogation, a function we are quite powerless to perform; the decision enunciated '*constitutional* standards for protection of the privilege' against self-incrimination. 384 U. S., at 491." 417 U. S., at 465–466 (emphasis in original).

*Miranda* clearly emphasized that warnings and an informed waiver are essential to the Fifth Amendment privilege itself. See *supra*, at 347 and this page. As noted in *Tucker*, *Miranda* did state that the Constitution does not require

"'adherence to any particular solution'" for providing the required knowledge and obtaining an informed waiver. 417 U. S., at 444 (quoting *Miranda, supra,* at 467). But to rely solely on this language in concluding that the *Miranda* warnings are not constitutional rights, as did the Court in *Tucker,* ignores the central issue. The Court in *Tucker* omitted to mention that in *Miranda,* after concluding that no "particular solution" is required, we went on to emphasize that "unless we are shown other procedures which are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it, the [prescribed] safeguards must be observed." *Miranda, supra,* at 467. Thus "the use of [any] admissions obtained in the absence of the required warnings [is] a flat violation of the Self-Incrimination Clause of the Fifth Amendment . . . ." *Orozco* v. *Texas,* 394 U. S. 324, 326 (1969).

The Court today finally recognizes these flaws in the logic of *Tucker* and *Quarles.*[30] Although disastrous in so many other respects, today's opinion at least has the virtue of rejecting the inaccurate assertion in *Quarles* that confessions extracted in violation of *Miranda* are not presumptively coerced for Fifth Amendment purposes. Cf. *Quarles, supra,* at 655, n. 5. Instead, the Court holds squarely that there is an "irrebuttable" presumption that such confessions are indeed coerced and are therefore inadmissible under the Fifth Amendment except in narrow circumstances. *Ante,* at 307.[31]

B

Unfortunately, the Court takes away with one hand far more than what it has given with the other. Although the

---

[30] For an incisive critique of *Tucker,* see Stone, The Miranda Doctrine in the Burger Court, 1977 S. Ct. Rev. 99, 115–125.

[31] The exceptions are where a confession is used to impeach the defendant's trial testimony, *Harris* v. *New York,* 401 U. S. 222 (1971), and where *Miranda* warnings were not given because of "pressing public safety concerns," *ante,* at 317, citing *New York* v. *Quarles,* 467 U. S. 649 (1984).

Court concedes, as it must, that a confession obtained in violation of *Miranda* is irrebuttably presumed to be coerced and that the Self-Incrimination Clause therefore prevents its use in the prosecution's case in chief, *ante,* at 306–307, the Court goes on to hold that nothing in the Fifth Amendment prevents the introduction at trial of evidence proximately derived from the illegal confession. It contends, for example, that the Fifth Amendment prohibits introduction "only" of the "compelled testimony," and that this constitutional guarantee "is not concerned with nontestimonial evidence." *Ante,* at 304, 307.

This narrow compass of the protection against compelled self-incrimination does not accord with our historic understanding of the Fifth Amendment. Although the Self-Incrimination Clause "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature," *Schmerber* v. *California,* 384 U. S. 757, 761 (1966), it prohibits the use of such communications "against" the accused in any way. The Fifth Amendment therefore contains a self-executing rule commanding the exclusion of evidence derived from such communications.[32] It bars "the use of compelled testimony, as well as evidence derived directly and indirectly therefrom," and "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect." *Kastigar* v. *United States,* 406 U. S. 441, 453 (1972) (emphasis in original). If a coerced statement leads to "sources of information which may supply other means of convicting" the accused, those sources must also be suppressed. *Counselman* v. *Hitchcock,* 142 U. S. 547, 586 (1892). Under this constitutional exclusionary rule, the authorities are thus

---

[32] The Court's reliance on *Schmerber* in support of its constricted view of the Fifth Amendment, *ante,* at 304, is wholly inappropriate. *Schmerber* had nothing to do with the derivative-evidence rule, but held only that the evidence compelled in the first instance in that case—blood samples—was nontestimonial in nature. 384 U. S., at 761.

"prohibited from making any . . . use of compelled testimony *and its fruits*" "in connection with a criminal prosecution against" the accused. *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 79 (1964) (emphasis added).[33]

In short, the Fifth Amendment's rule excluding "the use of compelled testimony and evidence derived therefrom is coextensive with the scope of the privilege" against self-incrimination itself. *Kastigar* v. *United States, supra,* at 452–453. "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used *at all.*" *Silverthorne Lumber Co.* v. *United States,* 251 U. S., at 392 (emphasis added). If the authorities were permitted to use an accused's illegal confession to extract additional confessions or to uncover physical evidence against him, the use of these fruits at trial would violate the Self-Incrimination Clause just as surely as if the original confession itself were introduced. Yet that is precisely what today's decision threatens to encourage.

What possible justification does the Court advance for its evisceration of the Fifth Amendment's exclusionary rule in this context? Two rationales appear to be at work here. First, while acknowledging that a confession obtained in the absence of warnings and an informed waiver is irrebuttably presumed to be coerced in violation of the Self-Incrimination Clause, *ante,* at 307, the Court recurrently asserts elsewhere that the extraction of such a confession is not really "a Fifth Amendment violation," *ante,* at 306. Thus the Court suggests that a *Miranda* violation does not constitute "police

---

[33] See also *United States* v. *Mandujano,* 425 U. S. 564, 576 (1976); *Maness* v. *Meyers,* 419 U. S. 449, 461 (1975); *Lefkowitz* v. *Turley,* 414 U. S. 70, 78 (1973) ("compelled answers and evidence derived therefrom" must be suppressed); *Ullmann* v. *United States,* 350 U. S. 422, 437 (1956) (Self-Incrimination Clause requires suppression of "knowledge and sources of information obtained from the compelled testimony"); *Hoffman* v. *United States,* 341 U. S. 479, 486 (1951); *Arndstein* v. *McCarthy,* 254 U. S. 71, 73 (1920).

infringement of a constitutional right," that it is not "a constitutional violation," that a suspect in such circumstances "suffer[s] no identifiable constitutional harm," and that his "Fifth Amendment rights" have not "actually [been] violated." *Ante,* at 304, 305, 307, 316. Similarly, the Court persists in reasoning that a confession obtained in violation of *Miranda* "ordinarily" should be viewed as "voluntary," a "voluntary disclosure of a guilty secret," "freely given," "noncoerc[ed]," and "wholly voluntary." *Ante,* at 311, 312, 318. I have already demonstrated the fallacy of this reasoning. See Part II–A, *supra.* Suffice it to say that the public will have understandable difficulty in comprehending how a confession obtained in violation of *Miranda* can at once be (1) "irrebuttabl[y]" presumed to be the product of official compulsion, and therefore suppressible as a matter of federal constitutional law, *ante,* at 307, 317, and (2) "noncoerc[ed]" and "wholly voluntary," *ante,* at 312, 318.

Second, while not discussed in today's opinion, JUSTICE O'CONNOR has recently argued that the Fifth Amendment's exclusion of derivative evidence extends only to confessions obtained when the accused is compelled "to appear before a court, grand jury, or other such formal tribunal," and not merely when he is "subject to informal custodial police interrogation." *New York* v. *Quarles,* 467 U. S., at 670 (O'CONNOR, J., concurring in part in judgment and dissenting in part). An accused in this situation, it is argued, "has a much less sympathetic case for obtaining the benefit of a broad suppression ruling." *Ibid.*

Such an analysis overlooks that, by the time we decided *Miranda,* it was settled that the privilege against self-incrimination applies with full force outside the chambers of "formal" proceedings. "Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda* v. *Arizona,* 384 U. S., at 467. See also

*Ziang Sung Wan* v. *United States*, 266 U. S. 1, 14–15 (1924) ("[A] confession obtained by compulsion must be excluded whatever may have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding *or otherwise*") (emphasis added); *Bram* v. *United States*, 168 U. S. 532 (1897). Thus there is no question that "all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning." *Miranda* v. *Arizona, supra,* at 461.

The application of the privilege to custodial interrogation simply reflects the realities and purposes of 20th-century police investigations, matters which the Court chooses to ignore. "[P]olice interrogation has in recent times performed the function once accomplished by interrogation of the defendant by the committing magistrate, a practice brought to an end by establishment of the rule against self-incrimination."[34] Moreover, "[a]s a practical matter, the compulsion to speak in the [police interrogation setting] may well be *greater* than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." 384 U. S., at 461 (emphasis added).[35] In addition, there can be no legitimate dispute that

---

[34] LaFave & Israel, *supra* n. 17, § 6.5(a), p. 480, n. 13. See also Y. Kamisar, Police Interrogation and Confessions 48–55 (1980); Morgan, The Privilege Against Self-Incrimination, 34 Minn. L. Rev. 1, 27, 28 (1949): "The function which the police have assumed in interrogating an accused is exactly that of the early committing magistrates, and the opportunities for imposition and abuse are fraught with much greater danger . . . . Investigation by the police is not judicial, but when it consists of an examination of an accused, it is quite as much an official proceeding as the early English preliminary hearing before a magistrate, and it has none of the safeguards of a judicial proceeding. . . . [T]his surely is an area that needs inclusion for reasons infinitely more compelling than those applicable to the arraignment."

[35] Accord, *Kastigar* v. *United States*, 406 U. S. 441, 461 (1972). As we observed in *Miranda*, "[a]n individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak." 384 U. S., at 461.

an incriminating statement obtained through custodial interrogation "is as revealing of leads" and other derivative evidence as a statement compelled before a judicial tribunal. *Murphy* v. *Waterfront Comm'n*, 378 U. S., at 103 (WHITE, J., concurring). Accordingly, *Miranda* itself emphasized that, under the Fifth Amendment exclusionary rule, *"no evidence obtained as a result of interrogation* can be used against" the defendant unless he was warned of his rights and gave an effective waiver. 384 U. S., at 479 (emphasis added).[36]

For these reasons, the Fifth Amendment itself requires the exclusion of evidence proximately derived from a confession obtained in violation of *Miranda*. The Court today has altogether evaded this constitutional command, the application of which should not turn simply on whether one is "sympathetic" to suspects undergoing custodial interrogation.

## C

Even if I accepted the Court's conclusion that the Fifth Amendment does not command the suppression of evidence proximately derived from a *Miranda* violation, I would nevertheless dissent from the Court's refusal to recognize the importance of deterring *Miranda* violations in appropriate circumstances. Just last Term, in *United States* v. *Leon*, 468 U. S. 897 (1984), the Court held that while the Fourth Amendment does not *per se* require the suppression of evidence derived from an unconstitutional search, the exclusionary rule must nevertheless be invoked where the search was objectively unreasonable. *Id.*, at 919–920, n. 20. Although

---

[36] Justices Clark and Harlan, dissenting in *Miranda*, recognized the applicability of the derivative-evidence rule. See, *e. g.*, *id.*, at 500 (Clark, J., dissenting in part and concurring in part in result) ("[F]ailure to follow the new procedures requires inexorably the exclusion of any statement by the accused, as well as the fruits thereof"); *id.*, at 522 (Harlan, J., dissenting). But see *id.*, at 545 (WHITE, J., dissenting) (question remains open).

I do not share the Court's view of the Fourth Amendment,[37] *Leon* at least had the virtue of recognizing that exclusion of derivative evidence is essential to the effective deterrence of objectively unreasonable failures by the authorities to obey the law. *Ibid.*

The Court today refuses to apply the derivative-evidence rule even to the extent necessary to deter objectively unreasonable failures by the authorities to honor a suspect's *Miranda* rights. Incredibly, faced with an obvious violation of *Miranda*, the Court asserts that it will not countenance suppression of a subsequent confession in such circumstances where the authorities have acted "legitimate[ly]" and have not used "improper tactics." *Ante*, at 312, 314. One can only respond: whither went *Miranda?*

The Court contends, however, that *Michigan* v. *Tucker*, 417 U. S. 433 (1974), already decided that the failure of the authorities to obey *Miranda* should not be deterred by application of the derivative-evidence rule. *Ante*, at 308–309. *Tucker* did *not* so decide. After criticizing the Fifth Amendment basis for exclusion, the Court in *Tucker* went on to note another " 'prime purpose' " for the exclusion of evidence—" 'to deter future unlawful police conduct and thereby effectuate the guarantee[s]' " of the Constitution. 417 U. S., at 446 (citation omitted). The Court emphasized that "[i]n a proper case this rationale would seem applicable to the Fifth Amendment context as well." *Id.*, at 447. Anticipating *Leon*, however, the Court asserted that the "deterrent purpose" was applicable only where "the police have engaged in willful, or at the very least negligent, conduct . . . ." 417 U. S, at 447. Because the questioning in *Tucker* occurred *before Miranda* was announced and was otherwise conducted in an objectively reasonable manner, the exclusion of the derivative evidence solely for failure to comply with the then-

---

[37] See *United States* v. *Leon*, 468 U. S., at 928 (BRENNAN, J., dissenting).

nonexistent *Miranda* requirement would not significantly deter future *Miranda* violations. As the Court noted, the "deterrence rationale loses much of its force" when there is nothing to deter. 417 U. S, at 447.

Far from rejecting the derivative-evidence rule, *Tucker* thus expressly invited its application in "a proper case" when the authorities have acted unreasonably. *Ibid.* Nearly every court and commentator considering the issue have correctly recognized that *Tucker*'s logic and its reliance on the Fourth Amendment "good faith" analysis compel the exclusion of derivative evidence where the police have deliberately, recklessly, or negligently violated the Fifth Amendment requirement of warnings and an effective waiver.[38]

Thus the Court's assertion today that *Tucker*'s "reasoning applies with equal force" to preclude application of the derivative-evidence rule in this case is a gross mischaracterization. *Ante,* at 308. If the police acted in an objectively unreasonable manner, see Part II–D, *infra,* *Tucker*'s "reasoning" instead requires suppression of Elstad's subsequent statement.

The Court clearly errs in suggesting that suppression of the "unwarned admission" alone will provide meaningful deterrence. *Ante,* at 309. The experience of lower courts demonstrates that the police frequently have refused to comply with *Miranda* precisely in order to obtain incriminating statements that will undermine the voluntariness of the accused's decision to speak again once he has received the usual warnings; in such circumstances, subsequent confes-

---

[38] See, *e. g., United States* v. *Downing,* 665 F. 2d, at 407; *State* v. *Preston,* 411 A. 2d, at 407–408 ("[I]f the rationale of the majority in *Tucker* is followed, it becomes important to determine in each such case of derivative evidence whether, in the circumstances, enforcement of the exclusionary rule has some tendency to deter the police from engaging in conduct violating the fifth and sixth amendment rights of the accused"); *In re Appeal No. 245 (75),* 29 Md. App., at 150–151, 349 A. 2d, at 445–446; Comment, 41 Brooklyn L. Rev., *supra* n. 21, at 339–340; Comment, 24 Clev. St. L. Rev. 689, 692–694 (1975).

sions often follow on a "silver platter." *Cagle* v. *State*, 45 Ala. App., at 4, 221 So. 2d, at 120. See generally *supra*, at 329–332. Expert interrogators themselves recognize the direct connection between such statements. *Supra*, at 328–329. And the Court's suggestion that its analysis might apply generally to "fruits" of illegal interrogations, but see n. 29, *supra*, blinks reality even further. For example, expert interrogators acknowledge that confessions are "'the prime source of other evidence.'"[39] If the police through illegal interrogation could discover contraband and be confident that the contraband "ordinarily" would not be suppressed, what possible incentive would they have to obey *Miranda?*

The Court simply has not confronted the basic premise of the derivative-evidence rule: that "[t]o forbid the direct use of methods . . . but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty.'" *Nardone* v. *United States*, 308 U. S., at 340.

> "[I]t is clear that if the police were permitted to utilize illegally obtained confessions for links and leads rather than being required to gather evidence independently, then the *Miranda* warnings would be of no value in protecting the privilege against self-incrimination. The requirement of a warning would be meaningless, for the police would be permitted to accomplish indirectly what they could not accomplish directly, and there would exist no incentive to warn." Pitler, 56 Calif. L. Rev., *supra* n. 16, at 620.

---

[39] C. O'Hara & G. O'Hara, Fundamentals of Criminal Investigation 131 (5th ed. 1980). See also Aubry & Caputo, *supra* n. 8, at 24–25; *id.*, at 27–28 ("Interrogation is valuable in developing information leading to the recovery of the fruits of the crime. . . . The process of interrogation ideally lends itself to the accomplishment of the recovery of the fruits of the crime, particularly in the areas of stolen property, contraband, and money"); O. Stephens, The Supreme Court and Confessions of Guilt 192 (1973) (survey-research findings).

As the Executive Director of the National District Attorneys Association Foundation emphasized shortly after *Miranda*, merely to exclude the statement itself while putting no curbs on the admission of derivative evidence "would destroy the whole basis for the rule in the first instance." Nedrud, The New Fifth Amendment Concept: Self-Incrimination Redefined, 2 J. Nat. Dist. Att. Assn. Found. 112, 114 (1966).[40] Yet that is precisely the result that today's disastrous opinion threatens to encourage. How can the Court possibly expect the authorities to obey *Miranda* when they have every incentive now to interrogate suspects without warnings or an effective waiver, knowing that the fruits of such interrogations "ordinarily" will be admitted, that an admissible subsequent confession "ordinarily" can be obtained simply by reciting the *Miranda* warnings shortly after the first has been procured and asking the accused to repeat himself, and that unless the accused can demonstrate otherwise his confession will be viewed as an "act of free will" in response to "legitimate law

---

[40] "What is the point of formulating comprehensive rules as the Court did in *Miranda* if the police still have a substantial incentive to continue to disregard these rules, if the police can still make use of all the leads and clues stemming from the inadmissible statements or confessions? You are not going to influence police practices greatly, you are not likely to get the police to change their procedures, if you permit them to operate on the premise that even if they pay no attention to *Miranda* they can still obtain and introduce in a trial valuable evidence derived from the suspect's statements.

.      .      .      .      .

". . . We should ask: Would admitting evidence or permitting testimony obtained under these circumstances give the police a significant incentive to act illegally?" A New Look At Confessions: Escobedo—The Second Round 150, 156 (B. George ed. 1967) (remarks of Professor Yale Kamisar).

See also Dershowitz & Ely, *Harris* v. *New York:* Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority, 80 Yale L. J. 1198, 1220 (1971); Pitler, 56 Calif. L. Rev., *supra* n. 16, at 619 ("There appears no logical reason to permit the fruits of a *Miranda* violation to be admissible. Any other holding, despite the cries of the disastrous effects on law enforcement, would emasculate the rights granted by *Miranda*") (footnote omitted).

enforcement activity"? *Ante,* at 311, 312. By condoning such a result, the Court today encourages practices that threaten to reduce *Miranda* to a mere "form of words," *Silverthorne Lumber Co.* v. *United States,* 251 U. S., at 392, and it is shocking that the Court nevertheless disingenuously purports that it "in no way retreats" from the *Miranda* safeguards, *ante,* at 317.

## D

Not content with its handiwork discussed above, the Court goes on and devotes considerable effort to suggesting that, "[u]nfortunately," *Miranda* is such an inherently "slippery," "murky," and "difficult" concept that the authorities in general, and the police officer conducting the interrogation in this case in particular, cannot be faulted for failing to advise a suspect of his rights and to obtain an informed waiver. *Ante,* at 309, 316. *Miranda* will become "murky," however, only because the Court's opinion today threatens to become a self-fulfilling prophecy. Although borderline cases occasionally have arisen respecting the concepts of "custody" and "interrogation," until today there has been nothing "slippery," "murky," or "difficult" about *Miranda* in the overwhelming majority of cases. The whole point of the Court's work in this area has been to prescribe "bright line" rules to give clear guidance to the authorities.[41]

Rather than acknowledge that the police in this case clearly broke the law, the Court bends over backwards to suggest why the officers may have been justified in failing to obey *Miranda.*

---

[41] *Solem* v. *Stumes,* 465 U. S. 638, 646–647 (1984). See also *Smith* v. *Illinois,* 469 U. S. 91 (1984) *(per curiam); Edwards* v. *Arizona,* 451 U. S. 477 (1981); *Fare* v. *Michael C.,* 442 U. S. 707, 718 (1979). See also Schulhofer, Confessions and the Court, 79 Mich. L. Rev. 865, 879 (1981) (although there "was some potential ambiguity at the fringes of 'custody' and 'interrogation,'" the Court in *Miranda* had "taken a big step toward clarifying the ground rules of permissible interrogation" and "provided plenty of guidance for the police").

*First.* The Court asserts that "[n]either the environment nor the manner of either 'interrogation' was coercive," noting that the initial interrogation took place in Elstad's "own home." *Ante,* at 315. The Court also believes that, "[a]lthough in retrospect the officers testified that respondent was then in custody, at the time he made his statement he had not been informed that he was under arrest." *Ibid.* There is no question, however, that Michael Elstad was in custody and "deprived of his freedom of action in [a] significant way" at the time he was interrogated. *Miranda* v. *Arizona,* 384 U. S., at 444. Two police officers had entered his bedroom, ordered him to get out of bed and come with them, stood over him while he dressed, taken him downstairs, and separated him from his mother. Tr. 64–65, 74–75, 80–84. The officers themselves acknowledged that Elstad was then under arrest. *Id.,* at 81–82. Moreover, we have made clear that police interrogation of an accused in custody triggers the *Miranda* safeguard even if he is in the "familiar surroundings" of his own home, precisely because he is no less " 'deprived of his freedom of action' " there than if he were at a police station. *Orozco* v. *Texas,* 394 U. S., at 326–327 (citation omitted).

Thus because Elstad was in custody, the circumstances of his interrogation were *inherently* coercive, and the Court once again flouts settled law in suggesting otherwise. "[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda* v. *Arizona,* 384 U. S., at 467. The Fifth Amendment's requirement of warnings and an informed waiver is "an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere." *Id.,* at 468.

*Second.* Without anything in the record to support its speculation, the Court suggests that Officer Burke's violation

of *Miranda* "may have been the result of confusion as to whether the brief exchange qualified as 'custodial interrogation' . . . ." *Ante*, at 315. There was no confusion on this point until today. Burke made Elstad sit down and, standing over him, said "[y]ou know why we're here," asked if he knew the Gross family, and "asked what he knew about the burglary." Tr. 83–84. This questioning obviously constituted interrogation because it was "reasonably likely to evoke an incriminating response" from Elstad, as it did. *Rhode Island* v. *Innis*, 446 U. S. 291, 301 (1980).

*Third.* The Court contends that the interrogation might be excusable because "the brief stop in the living room before proceeding to the station house was not to interrogate the suspect but to notify his mother of the reason for his arrest." *Ante*, at 315. Officer Burke's partner did take Elstad's mother into the kitchen to inform her of the charges, but Burke took Elstad into another room, sat him down, and interrogated him concerning "what he knew about the burglary." Tr. 84. How can the Court possibly describe this interrogation as merely informing Elstad's mother of his arrest?

*Finally.* The Court suggests that Burke's violation of Elstad's Fifth Amendment rights "may simply have reflected Burke's reluctance to initiate an alarming police procedure before McAllister had spoken with respondent's mother." *Ante*, at 315–316. As the officers themselves acknowledged, however, the fact that they "[took] the young fellow out of bed" had "[o]bviously" already created "tension and stress" for the mother, Tr. 64, which surely was not lessened when she learned that her son was under arrest. And if Elstad's mother was in earshot, as the Court assumes, it is difficult to perceive how listening to the *Miranda* warnings would be any more "alarming" to her than what she actually heard— actual interrogation of her son, including Burke's direct accusation that the boy had committed a felony. Most importantly, an individual's constitutional rights should not turn on

whether his relatives might be upset. Surely there is no "tender feelings" exception to the Fifth Amendment privilege against self-incrimination.[42]

## III

The Court's decision today vividly reflects its impatience with the constitutional rights that the authorities attack as standing in the way of combating crime. But the States that adopted the Bill of Rights struck that balance and it is not for this Court to balance the Bill of Rights away on a cost/benefit scale "where the 'costs' of excluding illegally obtained evidence loom to exaggerated heights and where the 'benefits' of such exclusion are made to disappear with a mere wave of the hand." *United States* v. *Leon*, 468 U. S., at 929 (BRENNAN, J., dissenting). It is precisely in that vein, however, that the Court emphasizes that the subsequent confession in this case was "voluntary" and "highly probative evidence," that application of the derivative-evidence presumption would cause the confession to be "irretrievably lost," and that such a result would come at an impermissibly "high cost to legitimate law enforcement activity." *Ante*, at 312.

Failure of government to obey the law cannot ever constitute "legitimate law enforcement activity." In any event, application of the derivative-evidence presumption does not

---

[42] If the Court means to suggest otherwise, the authorities would be well advised to arrest and interrogate suspects in the presence of loved ones so as to avoid the traumatizing need to obey *Miranda*. This procedure would fit in well with a classic interrogation ploy—the "you're just hurting yourself and your loved ones" technique. See, *e. g.*, Aubry & Caputo, *supra* n. 8, at 235: "The direct implication about hurting the loved ones can be made by statements to the effect of 'What are your wife and children going to think about you when they find out about this?' 'What are your kids going to think of their father?' The subject has most probably thought of little else since he was apprehended, and having these ideas forcefully brought to his attention by the interrogator is going to increase and intensify these fears and anxieties." See also W. Dienstein, Technics for the Crime Investigator 116 (2d ed. 1974).

"irretrievably" lead to suppression. If a subsequent confession is truly independent of earlier, illegally obtained confessions, nothing prevents its full use to secure the accused's conviction. If the subsequent confession *did* result from the earlier illegalities, however, there is nothing "voluntary" about it. And even if a tainted subsequent confession is "highly probative," we have never until today permitted probity to override the fact that the confession was "the product of constitutionally impermissible methods in [its] inducement." *Rogers* v. *Richmond*, 365 U. S. 534, 541 (1961). In such circumstances, the Fifth Amendment makes clear that the prosecutor has *no* entitlement to use the confession in attempting to obtain the accused's conviction.[43]

The lesson of today's decision is that, at least for now, what the Court decrees are "legitimate" violations by authorities of the rights embodied in *Miranda* shall "ordinarily" go undeterred. It is but the latest of the escalating number of decisions that are making this tribunal increasingly irrelevant in the protection of individual rights, and that are requiring other tribunals to shoulder the burden.[44] "There is hope, however, that in time this or some later Court will restore

[43] "The exclusion of an illegally procured confession and of any testimony obtained in its wake deprives the Government of nothing to which it has any lawful claim and creates no impediment to legitimate methods of investigating and prosecuting crime. On the contrary, the exclusion of evidence causally linked to the Government's illegal activity no more than restores the situation that would have prevailed if the Government had itself obeyed the law." *Harrison* v. *United States*, 392 U. S., at 224, n. 10.

[44] "In light of today's erosion of *Miranda* standards as a matter of federal constitutional law, it is appropriate to observe that no State is precluded by the decision from adhering to higher standards under state law. Each State has power to impose higher standards governing police practices under state law than is required by the Federal Constitution. . . . Understandably, state courts and legislatures are, as matters of state law, increasingly according protections once provided as federal rights but now increasingly depreciated by decisions of this Court." *Michigan* v. *Mosley*, 423 U. S. 96, 120–121 (1975) (BRENNAN, J., dissenting).

these precious freedoms to their rightful place as a primary protection for our citizens against overreaching officialdom." *United States* v. *Leon, supra,* at 960 (BRENNAN, J., dissenting).

I dissent.

JUSTICE STEVENS, dissenting.

The Court concludes its opinion with a carefully phrased statement of its holding:

> "We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Ante,* at 318.

I find nothing objectionable in such a holding. Moreover, because the Court expressly endorses the "bright-line rule of *Miranda,*" which conclusively presumes that incriminating statements obtained from a suspect in custody without administering the required warnings are the product of compulsion,[1] and because the Court places so much emphasis on the special facts of this case, I am persuaded that the Court intends its holding to apply only to a narrow category of cases in which the initial questioning of the suspect was made in a totally uncoercive setting and in which the first confession obviously had no influence on the second.[2] I nevertheless

---

[1] "When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief. The Court has carefully adhered to this principle, permitting a narrow exception only where pressing public safety concerns demanded. See *New York* v. *Quarles,* 467 U. S., at 655–656. The Court today in no way retreats from the bright-line rule of *Miranda.*" *Ante,* at 317.

[2] The Court emphasizes the noncoercive setting in which the initial interview occurred, *ante,* at 300–301, 315; the apparent candor of the respondent during both of his interviews with the police, *ante,* at 301–302; and the absence of any evidence suggesting that the second confession was motivated by the first, *ante,* at 315–316. Further, the Court characterizes

dissent because even such a narrowly confined exception is inconsistent with the Court's prior cases, because the attempt to identify its boundaries in future cases will breed confusion and uncertainty in the administration of criminal justice, and because it denigrates the importance of one of the core constitutional rights that protects every American citizen from the kind of tyranny that has flourished in other societies.

## I

The desire to achieve a just result in this particular case has produced an opinion that is somewhat opaque and internally inconsistent. If I read it correctly, its conclusion rests on two untenable premises: (1) that the respondent's first confession was not the product of coercion;[3] and (2) that no constitutional right was violated when respondent was questioned in a tranquil, domestic setting.[4]

---

the first confession as "patently *voluntary*," *ante*, at 307 (emphasis in original), because it was not the product of any "physical violence or other deliberate means calculated to break the suspect's will," *ante*, at 312. Moreover, the Court—apparently not satisfied that the State has conceded that respondent was in custody at the time of the unwarned admission, *ante*, at 315—launches into an allegedly fact-based discussion of this "issue," going out of its way to speculate about the probable good faith of the officers. See *ante*, at 315–316 ("This breach may have been the result of confusion as to whether the brief exchange qualified as 'custodial interrogation' or it may simply have reflected Burke's reluctance to initiate an alarming police procedure before McAllister had spoken with respondent's mother"). Finally, the Court makes its own finding that the failure to give *Miranda* warnings was an "oversight." *Ante*, at 316.

[3] *Ante*, at 309 ("It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period"); *ante*, at 311 ("*voluntary* unwarned admissions") (emphasis in original); *ante*, at 312 ("When neither the initial nor the subsequent admission is coerced"); *ante*, at 314 ("absent deliberately coercive or improper tactics in obtaining the initial statement").

[4] *Ante*, at 304 (rejecting contention that "a failure to administer *Miranda* warnings necessarily breeds the same consequences as police infringement

Even before the decision in *Miranda* v. *Arizona*, 384 U. S. 436 (1966), it had been recognized that police interrogation of a suspect who has been taken into custody is presumptively coercive. That presumption had its greatest force when the questioning occurred in a police station, when it was prolonged, and when there was evidence that the prisoner had suffered physical injury. To rebut the presumption, the prosecutor had the burden of proving the absence of any actual coercion.[5] Because police officers are generally more credible witnesses than prisoners and because it is always difficult for triers of fact to disregard evidence of guilt when addressing a procedural question, more often than not the presumption of coercion afforded only slight protection to the accused.

The decision in *Miranda* v. *Arizona* clarified the law in three important respects. First, it provided the prosecutor with a simple method of overcoming the presumption of coercion.[6] If the police interrogation is preceded by the warning specified in that opinion, the usual presumption does not attach. Second, it provided an important protection to the accused by making the presumption of coercion irrebuttable if the prescribed warnings are not given.[7] Third, the decision

___

of a constitutional right"); *ante,* at 305 ("Respondent's contention that his confession was tainted by the earlier failure of the police to provide *Miranda* warnings and must be excluded as 'fruit of the poisonous tree' assumes the existence of a constitutional violation"); *ante,* at 306 ("[A] procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment"); *ibid.* ("The *Miranda* exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself"); *ante,* at 318 ("[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary").

[5] See, *e. g., People* v. *La Frana,* 4 Ill. 2d 261, 268, 122 N. E. 2d 583, 586–587 (1954); cf. *People* v. *Nemke,* 23 Ill. 2d 591, 601, 179 N. E. 2d 825, 830 (1962).

[6] 384 U. S., at 444–445.

[7] *Id.,* at 444 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defend-

made it clear that a self-incriminatory statement made in response to custodial interrogation was always to be considered "compelled" within the meaning of the Fifth Amendment to the Federal Constitution if the interrogation had not been preceded by appropriate warnings.[8]   Thus the irrebuttable presumption of coercion that applies to such a self-incriminatory statement, like a finding of actual coercion, renders the resulting confession inadmissible as a matter of federal constitutional law.[9]

---

ant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination"); *id.*, at 467–469.

[8] *Id.*, at 445, 448, 457–458 ("Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice").

[9] In 1964, the Court held that the "Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy* v. *Hogan,* 378 U. S. 1, 8. Two years later, in *Miranda* v. *Arizona,* 384 U. S. 436 (1966), the Court held that the State of Arizona had deprived Miranda of his liberty without due process of law because his conviction was based on a confession that had been obtained in violation of his Fifth Amendment privilege against self-incrimination.   Obviously, the Court's power to reverse Miranda's conviction rested entirely on the determination that a violation of the Federal Constitution had occurred.

The constitutional violation was established without any evidence that the police actually coerced Miranda in any way.   *Id.*, at 445, 491–492. The fact that Miranda had confessed while he was in custody and without having been adequately advised of his right to remain silent was sufficient to establish the constitutional violation.   To phrase it another way, the absence of an adequate warning plus the fact of custody created an irrebuttable presumption of coercion.   *Id.*, at 492.   Thus, the Court wrote: "To be sure, the records do not evince overt physical coercion or patent psychological ploys.   The fact remains that in none of these cases did the officers undertake to afford appropriate safeguards at the outset of the interrogation to insure that the statements were truly the product of free choice."   *Id.*, at 457.

In my opinion, the Court's attempt to fashion a distinction between actual coercion "by physical violence or other deliberate means calculated to break the suspect's will," *ante*, at 312, and irrebuttably presumed coercion cannot succeed. The presumption is only legitimate if it is assumed that there is always a coercive aspect to custodial interrogation that is not preceded by adequate advice of the constitutional right to remain silent. Although I would not support it, I could understand a rule that refused to apply the presumption unless the interrogation took place in an especially coercive setting—perhaps only in the police station itself—but if the presumption arises whenever the accused has been taken into custody or his freedom has been restrained in any significant way, it will surely be futile to try to develop subcategories of custodial interrogation.[10] Indeed, a major purpose of treating the presumption of coercion as irrebuttable is to avoid the kind of fact-bound inquiry that today's decision will surely engender.[11]

As I read the Court's opinion, it expressly accepts the proposition that routine *Miranda* warnings will not be sufficient to overcome the presumption of coercion and thereby make a second confession admissible when an earlier confession is tainted by coercion "by physical violence or other

---

See also *id.*, at 448 ("[T]his Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition"); *id.*, at 477.

[10] Of course, in *Orozco v. Texas*, 394 U. S. 324 (1969), this Court rejected the contention that *Miranda* warnings were inapplicable because a defendant "was interrogated on his own bed, in familiar surroundings." *Id.*, at 326–327.

[11] *Miranda v. Arizona*, 384 U. S., at 468; *New York v. Quarles*, 467 U. S. 649, 664 (1984) (O'CONNOR, J., concurring in part in judgment and dissenting in part) ("When police ask custodial questions without administering the required warnings, *Miranda* quite clearly requires that the answers received be presumed compelled and that they be excluded from evidence at trial"); *Orozco v. Texas*, 394 U. S., at 324.

deliberate means calculated to break the suspect's will."[12] Even in such a case, however, it is not necessary to assume that the earlier confession will always "effectively immunize" a later voluntary confession. But surely the fact that an earlier confession was obtained by unlawful methods should add force to the presumption of coercion that attaches to subsequent custodial interrogation and should require the prosecutor to shoulder a heavier burder of rebuttal than in a routine case. Simple logic, as well as the interest in not providing an affirmative incentive to police misconduct, requires that result. I see no reason why the violation of a rule that is as well recognized and easily administered as the duty to give *Miranda* warnings should not also impose an additional burden on the prosecutor.[13] If we are faithful to the holding in

---

[12]*Ante,* at 312; see also *ante,* at 314 ("We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion").

[13] In view of the Court's holding, it is not necessary to consider how that additional burden should be discharged in all cases. In general, however, I should think that before the second session of custodial interrogation begins, the prisoner should be advised that his earlier statement is, or may be, inadmissible. I am not persuaded that the *Miranda* rule is so "murky," *ante,* at 316, that the law enforcement profession would be unable to identify the cases in which a supplementary warning would be appropriate. *Miranda* was written, in part, "to give concrete constitutional guidelines for law enforcement agencies and courts to follow." 384 U. S., at 441–442; *id.,* at 468 (noting that the "Fifth Amendment privilege is *so fundamental* to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege *so simple*") (emphasis added). Nearly two decades after that disposition, it is undisputed that the *Miranda* rule—now so deeply embedded in our culture that most schoolchildren know not only the warnings, but also when they are required—has given that clarity. See *New York* v. *Quarles,* 467 U. S., at 660 (O'CONNOR, J., concurring in part in judgment and dissenting in part) (noting *Miranda*'s "now clear strictures"); *Rhode Island* v. *Innis,* 446 U. S. 291, 304 (1980) (BURGER, C. J., concurring in judgment) (the "meaning of *Miranda* has become reasonably clear and law enforcement

*Miranda* itself, when we are considering the admissibility of evidence in the prosecutor's case in chief, we should not try to fashion a distinction between police misconduct that warrants a finding of actual coercion and police misconduct that establishes an irrebuttable presumption of coercion.

## II

For me, the most disturbing aspect of the Court's opinion is its somewhat opaque characterization of the police misconduct in this case. The Court appears ambivalent on the question whether there was any constitutional violation.[14] This ambivalence is either disingenuous or completely lawless. This Court's power to require state courts to exclude probative self-incriminatory statements rests entirely on the premise that the use of such evidence violates the Federal Constitution.[15] The same constitutional analysis applies

---

practices have adjusted to its strictures"); *Fare* v. *Michael C.*, 442 U. S. 707, 717 (1979) ("The rule the Court established in *Miranda* is clear"); Stephens, Flanders, & Cannon, Law Enforcement and the Supreme Court: Police Perceptions of the *Miranda* Requirements, 39 Tenn. L. Rev. 407, 431 (1972). At the same time, it has ensured the right to be free from self-incrimination that the Constitution guarantees to all. Moreover, many professionals are convinced that, rather than hampering law enforcement, the *Miranda* rule has helped law enforcement efforts. See Jacobs, The State of *Miranda*, Trial 45 (Jan. 1985) ("[I]ncreased professionalism of police . . . has resulted from the challenging combination of *Miranda* and *Gideon* v. *Wainwright* [and] has benefited both police and prosecutors in preparing good cases"). Nevertheless, the Court today blurs *Miranda*'s clear guidelines. The author of today's opinion—less than one Term ago—summarized precisely my feelings about the Court's disposition today: "*Miranda* is now the law, and in my view, the Court has not provided sufficient justification for departing from it or for blurring its now clear strictures." *New York* v. *Quarles*, 467 U. S., at 660 (O'CONNOR, J., concurring in part in judgment and dissenting in part).

[14] See n. 4, *supra.* Indeed, the Court's holding rests on its view that there were no "improper tactics in obtaining the initial statement." See *ante,* at 314.

[15] At least that is my view. In response to this dissent, however, the Court has added a footnote, *ante,* at 306–307, n. 1, implying that whenever

whether the custodial interrogation is actually coercive or irrebuttably presumed to be coercive. If the Court does not accept that premise, it must regard the holding in the *Miranda* case itself, as well as all of the federal jurisprudence that has evolved from that decision, as nothing more than an illegitimate exercise of raw judicial power.[16] . If the Court accepts the proposition that respondent's self-incriminatory statement was inadmissible, it must also acknowledge that the Federal Constitution protected him from custodial police interrogation without first being advised of his right to remain silent.

The source of respondent's constitutional protection is the Fifth Amendment's privilege against compelled self-incrimination that is secured against state invasion by the Due Process Clause of the Fourteenth Amendment. Like many other provisions of the Bill of Rights, that provision is merely a procedural safeguard. It is, however, the specific provision that protects all citizens from the kind of custodial interrogation that was once employed by the Star Chamber,[17] by "the Germans of the 1930's and early 1940's," [18] and by some of our own police departments only a few decades ago.[19]

---

the Court commands exclusion of a presumptively coerced confession, it is standing—not on a constitutional predicate—but merely on its own shoulders.

[16] The *Miranda* Court explicitly recognized the contrary when it stated that "our holding is not an innovation in our jurisprudence, but is an application of principles long recognized and applied in other settings." 384 U. S., at 442. See also *id.*, at 445 ("The constitutional issue we decide in each of these cases is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way"); *id.*, at 460–467.

[17] See *id.*, at 458–459; E. Cleary, McCormick on Evidence § 114 (2d ed. 1972); 8 J. Wigmore, Evidence § 2250 (McNaughton rev. ed. 1961).

[18] See Burger, Who Will Watch the Watchman, 14 Am. U. L. Rev. 1, 14 (1964).

[19] See, *e. g., Leyra* v. *Denno,* 347 U. S. 556 (1954); *Malinski* v. *New York,* 324 U. S. 401 (1945); *Ashcraft* v. *Tennessee,* 322 U. S. 143 (1944); *Ward* v. *Texas,* 316 U. S. 547 (1942); *Vernon* v. *Alabama,* 313 U. S. 547

Custodial interrogation that violates that provision of the Bill of Rights is a classic example of a violation of a constitutional right.

I respectfully dissent.

---

(1941); *White* v. *Texas*, 310 U. S. 530 (1940); *Canty* v. *Alabama*, 309 U. S. 629 (1940); *Chambers* v. *Florida*, 309 U. S. 227 (1940); *Brown* v. *Mississippi*, 297 U. S. 278 (1936); *Wakat* v. *Harlib*, 253 F. 2d 59 (CA7 1958); *People* v. *La Frana*, 4 Ill. 2d 261, 122 N. E. 2d 583 (1954); cf. *People* v. *Portelli*, 15 N. Y. 2d 235, 205 N. E. 2d 857 (1965) (potential witness tortured by police). Such custodial interrogation is, of course, closer to that employed by the Soviet Union than that which our constitutional scheme tolerates. See *Coleman* v. *Alabama*, 399 U. S. 1, 15–16 (1970) (opinion of Douglas, J.) ("In [Russia] detention *incommunicado* is the common practice, and the period of permissible detention now extends for nine months. Where there is custodial interrogation, it is clear that the critical stage of the trial takes place long before the courtroom formalities commence. That is apparent to one who attends criminal trials in Russia. Those that I viewed never put in issue the question of guilt; guilt was an issue resolved in the inner precincts of a prison under questioning by the police").